Argued and submitted May 15, 2000, decision of Tax Court reversed and case remanded to that court December 20, 2001, petition for reconsideration allowed by opinion April 18, 2002
See 334 Or 11, 45 P3d 107 (2002)

## SHILO INN PORTLAND/205, LLC,
### *Appellant,*

*v.*

## MULTNOMAH COUNTY,
### City of Portland,
### and Portland Development Commission,
### *Respondents,*

*and*

## DEPARTMENT OF REVENUE,
### *Intervenor Below.*

### (OTC 4370; SC S46816)

36 P3d 954

Gregory W. Byrne, Portland, argued the cause and filed the briefs for appellant.

Jeannette N. Launer, Pacific City, argued the cause for respondent Portland Development Commission. With her on the brief were Sandra Duffy, Chief Assistant County Counsel, Portland, for respondent Multnomah County; Linda Meng, Chief Deputy City Attorney, Portland, for respondent City of Portland; Karen Williams, Portland, for respondent Portland Development Commission; Douglas M. Adair, Assistant Attorney General, Salem, and Hardy Myers, Attorney General, for intervenor Department of Revenue.

Glenn Klein, of Harrang, Long, Gary, Rudnick, P.C., Eugene, filed the brief for *amici curiae* League of Oregon Cities and Association of Oregon Development Agencies.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, and Riggs, Justices.**

GILLETTE, J.

** Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of the case; Kulongoski, J., resigned June 14, 2001, and did not participate in the decision of this case; De Muniz and Balmer, JJ., did not participate in the consideration or decision of this case.

**GILLETTE, J.**

In this ad valorem property tax case, the issue is whether all taxes assessed on property located within an urban renewal area and used to pay urban renewal indebtedness must be characterized as taxes "raised to fund government operations other than the public school system," as that phrase is used in Article XI, section 11b(1), of the Oregon Constitution. The Oregon Tax Court held that they need not be so characterized. *Shilo Inn v. Multnomah County*, 15 OTR 36 (1999). That court concluded that the part of the taxes in question that was disbursed to urban renewal agencies properly is characterized as taxes "raised specifically to fund the public school system," as that phrase is used in the same constitutional provision. *Id.* at 44-45. For the reasons that follow, we reverse the decision of the Tax Court.

This case comes to us on review of the Tax Court's grant of summary judgment to the Portland Development Commission (PDC), which was one of the respondents in the Tax Court proceeding. No material facts are in dispute. Taxpayer owns two parcels of real property within the City of Portland. Each is located in an urban renewal area that was established by the city and PDC, which is an urban renewal agency, in 1986. The real market value of taxpayer's property for the 1998-99 tax year was $15,297,600, and the assessed value was $11,155,970.

For the 1998-99 tax year, taxpayer paid $234,005.06 in ad valorem property taxes. Those taxes were distributed among the various taxing districts in which taxpayer's property is located, principally to the Parkrose School District, the City of Portland, Multnomah County, and to PDC.[1] Taxpayer contends, and respondents concede, that part of the taxes reflected on taxpayer's property tax bill as taxes for "schools" actually was disbursed to PDC. As taxpayer reads the constitution, however, Article XI, section 11b(1) (hereafter called

---

[1] Ad valorem property taxes are assessed in a combined statement by each county, which then allocates the taxes to the various entities, such as cities, school districts, and other governmental units within the county to which the taxes actually are owed. PDC is not specifically identified on petitioner's tax statements as a recipient of taxes.

"Measure 5"),[2] requires that all taxes ultimately disbursed by the tax collector to the urban renewal agency for payment of urban renewal indebtedness be treated as having been raised for a nonschool purpose and be added to the "government operations other than schools" amount shown on the tax statement. By a series of calculations, taxpayer arrives at the part of its property tax that was characterized as for "schools" that taxpayer contends instead was paid over to the urban renewal agency for the tax year in question. According to taxpayer, when that amount is subtracted from the amount on taxpayer's tax bill that is designated for schools, and is added to the amount on taxpayer's tax bill that is designated for government operations other than schools, the total amount of taxpayer's tax bill attributable to taxes for government operations other than schools becomes $159,099.[3]

Taxpayer points out that, under Measure 5, the taxes that constitutionally could be imposed on its property for the 1998-99 tax year for government operations other than the public school system could not exceed $10 per $1,000 of the property's real market value—in this case, $152,976. Because the $159,099 that taxpayer claims is attributable to government operations other than schools is $6,123 more than the amount that Measure 5 permits, taxpayer claims to have been overcharged by the taxing authority by that amount.[4] As noted, the Tax Court denied relief.

---

[2] Article XI, section 11b(1), of the Oregon Constitution, is the first section of an amendment to the Oregon Constitution that the voters adopted in 1990 and was (and still is) known as "Measure 5." As adopted, Measure 5 included Article XI, section 11b-11f, of the Oregon Constitution. The voters repealed section 11f on May 20, 1997, as part of Measure 50, which is discussed at length elsewhere in this opinion. Throughout this opinion, we refer at times to the constitutional provisions at issue by their measure numbers, rather than referring to them exclusively by the pertinent citations to the constitution, because the measure numbers continue to be used in common parlance by the bench, bar, and public.

[3] Although respondents assert that the process that taxpayer used to arrive at that figure is flawed, they did not contend either to the Tax Court or to this court that the figures set out in the text are incorrect.

[4] Taxpayer also claimed in its complaint to the Tax Court that it was bringing the present action for the benefit of all similarly situated taxpayers who, it contended, collectively were overcharged over $7.5 million for the 1998-99 tax year. Accordingly, taxpayer also moved for class action status and claimed entitlement to attorney fees under ORS 305.587, which authorizes the Tax Court to order such relief as it considers appropriate. Because the Tax Court granted summary judgment against taxpayer on the merits, that court did not consider whether to certify the class.

To place the present dispute in context, some background is necessary. In 1990, the voters approved Measure 5, which added Article XI, section 11b, to the Oregon Constitution. Subsection (1) of that measure provides:

"[T]axes imposed upon any property shall be separated into two categories: One which dedicates revenues raised specifically to fund the public school system and one which dedicates revenues raised to fund government operations other than the public school system. The taxes in each category shall be limited as set forth in the table which follows and these limits shall apply whether the taxes imposed on property are calculated on the basis of the value of that property or on some other basis:

"MAXIMUM ALLOWABLE TAXES

"For each $1000.00 of
Property's Real Market Value

| *Fiscal Year* | *School System* | *Other than Schools* |
|---|---|---|
| "* * * * * | | |
| "1995-1996 and thereafter | $5.00 | $10.00 |

"Property tax revenues are deemed to be dedicated to funding the public school system *if the revenues are to be used exclusively for educational services*, including support services, provided by some unit of government, at any level from pre-kindergarten through post-graduate training."

Or Const, Art XI, § 11b(1) (emphasis added). In addition, Measure 5 created a third category of property taxes for, among other things, "bonded indebtedness authorized by a specific provision of this Constitution." Or Const, Art XI, § 11b(3)(a). That last category was not subject to the foregoing limitations. *Id.*

To address the situation in which taxes imposed by the various taxing districts exceed the limits for the school or nonschool categories, or for both, Measure 5 included a procedure for "compression" of taxes within each category. Subsection (4) of Article XI, section 11b, provides:

"In the event that taxes authorized by any provision of this Constitution to be imposed on any property should

exceed the limitation imposed on either category of taxing units defined in subsection (1) of this section, then, notwithstanding any other provision of this Constitution, the taxes imposed upon such property by the taxing units in that category shall be reduced evenly by the percentage necessary to meet the limitation for that category."[5]

In 1997, the legislature proposed and the people adopted Measure 50, which repealed, among other things, the then-existing Article XI, section 11, and replaced it with an entirely new section 11.[6] Measure 50 transformed the ad valorem property tax scheme from a "levy-based" system to a "rate-based" system. Among its other effects, the measure reduced the assessed value of property to 10 percent below 1995 levels, Or Const, Art XI, § 11(1)(a), limited the amount of any increase in assessed value to three percent per year, Or Const, Art XI, § 11(1)(b), and required each "local taxing district"[7] to certify a "permanent limit on the rate of ad valorem property taxes imposed by the district for tax years beginning after July 1, 1997" (the "permanent rate"), Or Const, Art XI, § 11(3), to be applied to each property in that district. Simply stated, that permanent rate is calculated,

---

[5] Part of the basis for the present dispute stems from the fact that subsection (4) of Article XI, section 11b, refers to categories of *taxing units*, rather than to categories of *taxes*, and suggests that categories of taxing units were "defined" in subsection (1). Subsection (1), however, does not provide such a definition. For the moment, we need note only that the contrasting wording in the two sections is inartful, at the least.

[6] The new section 11 did not repeal section 11b, which, as we have explained, is the official label for Measure 5. *Former* section (11), which Measure 50 repealed, provided for tax base limitations. Importantly, Measure 50 also repealed another property-tax-limiting initiative measure, Measure 47, which the voters had approved a year earlier, in 1996. Measure 47 was a short-lived constitutional amendment aimed at closing what its supporters considered to be a significant loophole in the property tax limitation goal of Measure 5. *Former* Or Const, Art XI, 11g, 11h, 11i and 11j. Certain practical and technical difficulties in the application of Measure 47 led the legislature to propose, and the people to adopt, Measure 50 as its effective replacement.

[7] We note that Measure 50 employs the phrase "local taxing district," while Measure 5 and Article IX, section 1(c), use the phrases "taxing units" and "governmental units." In addition, the statutes implementing Measures 5 and 50 employ still different phraseology in various sections. Neither party has suggested that we ascribe a difference in meaning based on the difference in phraseology, and we perceive no reason to do so. Accordingly, we assume *for purposes of this opinion* that the foregoing terms, *viz.*, "local taxing district," "taxing units," and "governmental units," are interchangeable. For the sake of consistency, we use the phrase "taxing district" throughout this opinion.

first, by determining the taxes that could have been imposed for tax year 1997-98 under Measure 5, had Measure 50 not been adopted (and not taking into account Measure 47), then reducing that amount by 17 percent, and, finally, dividing those taxes by the assessed value of property in the district. Or Const, Art XI, §§ 11(3)(a)(A) and 11(3)(b). Measure 50 also includes a detailed compression formula to ensure that no district exceeds the "$5 (public school system) and $10 (other government)" limits.[8] Or Const, Art XI, § 11(11)(b) and (c).

The foregoing constitutional provisions were super-imposed on a tax scheme that already authorized the division of taxes to pay urban renewal indebtedness. Since 1960, property within an urban renewal area has been subject to "tax increment" financing, or division, under Article IX, section 1c, of the Oregon Constitution.[9] Under that constitutional provision and the statutory system that implemented it, urban renewal agencies, have had no authority to levy taxes themselves. Instead, the taxing districts in which an urban renewal area is located, such as cities, counties, and school districts, levy the taxes that ultimately are used to repay the indebtedness for urban renewal projects. The county assessor certifies the value of property located within an urban renewal area on the effective date of the adoption of the urban renewal plan (the "frozen value" or "frozen base") and segregates that amount from the (presumably higher) assessed value of the property for the later tax year in question. Then, taxes derived by imposing the district's tax rate

---

[8] That formula, similar to the one contained in Measure 5 (Or Const, Art XI, § 11b(4)), refers numerous times to "categories" of "local taxing districts" that are subject to the Measure 5 limits. *See, e.g.*, Or Const, Art XI, § 11(c)(B) ("If property taxes exceed the limitations imposed under either category of local taxing district * * *"); Or Const, Art XI, § 11(c)(B)(i) ("[a]ny local option * * * taxes * * * shall be proportionally reduced by those local taxing districts within the category * * *"); Or Const, Art XI, § 11(c)(B)(ii) ("* * * all other ad valorem property taxes shall be proportionally reduced by those taxing districts within the category * * *").

[9] That section, as amended in 1997 by Measure 50, provides as follows:

"The Legislative Assembly may provide that the ad valorem taxes levied by any taxing unit, in which is located all or part of an area included in a redevelopment or urban renewal project, may be divided so that the taxes levied against any increase in the assessed value, as defined by law, of property in such area obtaining after the effective date of the ordinance or resolution approving the redevelopment or urban renewal plan for such area, shall be used to pay any indebtedness incurred for the redevelopment or urban renewal project."

on the frozen base are disbursed to the taxing districts that levied the tax, while taxes derived by applying that rate to the increase in property value over the frozen base are disbursed to the urban renewal agency to pay indebtedness incurred for the urban renewal project.

Over the last decade, with the adoption of Measures 5 and 50, the procedures for allocating funds to pay urban renewal indebtedness have changed. Under the former, "levy-based" system, and before the adoption of Measure 5 in 1990, each taxing district notified the assessor of the *amount* of revenue to be raised for that district. In an urban renewal area, the assessor then calculated the levy rate for each taxing district by dividing the amount to be raised by the frozen value of the property in that district and then "extended" that rate to the entire assessed value of the property. Because the increase in property value over the frozen base, or increment, was excluded in setting the tax rate, applying the rate to the higher value generated funds beyond the budgeted needs of the taxing districts. The taxes generated on the frozen base were allocated to the budgeted requirements of the taxing districts, while the additional, often called "excess," taxes were allocated to the urban renewal agency. *See Dennehy v. Dept. of Rev.*, 305 Or 595, 598-99, 756 P2d 13 (1988) (explaining that process).

Measure 5, which, as noted, retained the levy-based system, did not mention urban renewal or redevelopment funding or otherwise provide a specific method for categorizing or dividing taxes that were to be applied for an urban renewal purpose. After the adoption of Measure 5 in 1990, the legislature amended the urban renewal statutes to reconcile the division of taxes for urban renewal purposes with the Measure 5 limits. *See* ORS 457.420 to ORS 457.450 (1991) (so providing). Under those statutes, urban renewal taxes were calculated in a manner similar to the pre-Measure 5 calculation method, that is, the taxing districts notified the assessor of the amount of taxes needed, the assessor then calculated a levy rate based on the frozen value and extended that rate to the increment to raise "excess" funds, which in turn were to be used to pay for urban renewal. However, the assessor's statutory duty to collect taxes that would be divided for urban renewal purposes expressly was made

"subject to section 11b, Article XI of the Oregon Constitution [Measure 5]." ORS 457.440(6) (1991).[10]

In 1996, the voters approved Measure 47, which, as we have explained, also was a constitutional amendment aimed at reducing and limiting property taxes. Like Measure 5, Measure 47 contained no references to urban renewal. Then, in 1997, the voters approved Measure 50, which replaced Measure 47. As noted, Measure 50 transformed the tax scheme from a levy-based system to a rate-based system and imposed new limits on the growth of property taxes. Unlike Measure 5 or Measure 47, Measure 50 does contain several provisions directly dealing with urban renewal taxes.

The first references in Measure 50 to urban renewal taxes pertain to the calculation of the permanent rate. Subsection (3) of Article XI, section 11, specifically excepts from the mandatory 17 percent reduction in taxes, *inter alia*, taxes to pay bonded indebtedness and "taxes described in section 1c, Article IX of this Constitution," which authorizes taxes levied against the increase in value of directly affected properties to fund redevelopment or urban renewal programs. Or Const, Art XI, § 11(3)(a)(B). Only those *reduced* taxes, that is, those taxes that would have been imposed other than for bond repayment and urban renewal, are used to calculate the permanent rate. Or Const, Art XI, § 11(3)(b). The permanent rate, therefore, raises only the taxing districts' operating taxes; it is not intended to generate taxes that pay the cost of

---

[10] Although the statutes implementing Measure 5 themselves did not specify how taxes used to pay urban renewal indebtedness were to be treated, the Attorney General had issued an opinion in 1990, before the election at which the people adopted Measure 5, concluding that,

"[e]xcept for revenue used to pay bonded indebtedness, revenue generated by tax increment financing that funds the activities of an urban renewal agency, is subject to the 'other than schools' limit under the proposed measure."

46 Op Atty Gen 388, 429 (1990). In addition, the Attorney General specifically addressed urban renewal revenues derived from school district levies:

"All urban renewal tax increment revenues are subject to the nonschool limit, whether or not the amount of those revenues is determined in part by the rate applicable to a school district levy, because those revenues are not dedicated to be used 'exclusively for educational purposes.' "

*Id.* at 431-32. The Department of Revenue also promulgated a regulation codifying that conclusion. *Former* OAR 150-457.440(7)(h) (1990) (amended 1991).

urban renewal. That conclusion is confirmed in subsection (3)(g) of Article XI, section 11, which provides:

"Urban renewal levies described in this subsection shall be imposed as provided in subsections (15) and (16) of this section and *may not be imposed under this subsection.*"

(Emphasis added.)

A necessary result of that scheme, however, is that the permanent rate does not generate sufficient taxes to pay both the various taxing districts' operating taxes and the taxes needed to pay existing urban renewal indebtedness. That is so because, under Measure 50, in existing urban renewal areas, the district's operating taxes themselves must be divided to fund urban renewal programs. Article XI, section 11(15), set out below, mandates in those circumstances that taxes on the increment be used "exclusively" for urban renewal. At the same time, however, the new Measure 50 system does not contemplate the existence of "excess" taxes, as were generated under the old levy-based system, because the permanent rate is based on the entire assessed value of the property, not just the frozen base. Or Const, Art XI, § 11(3)(b).

The remaining references in Measure 50 to urban renewal are located in subsections (15) and (16) of Article XI, section 11. Those provisions address the funding of existing and future urban renewal indebtedness. We turn first to subsection (15).

In addition to its other effects, subsection (15) provides the mechanism for funding urban renewal programs instituted *after* the adoption of Measure 50. That subsection provides:

"If ad valorem property taxes are divided as provided in section 1c, Article IX of this Constitution, in order to fund a redevelopment or urban renewal project, then notwithstanding subsection (1) of this section, the ad valorem property taxes levied against the increase shall be used exclusively to pay any indebtedness incurred for the redevelopment or urban renewal project."[11]

---

[11] We observe in passing that the reference in the above-quoted passage to "subsection (1) of this section" makes no sense in context. Subsection (1) of section 11 sets new maximum assessed values of properties for ad valorem tax purposes.

As described above, a taxing district's permanent rate raises its operating taxes. If an urban renewal plan eventually is instituted in a district in which there was no urban renewal area when Measure 50 was adopted, then the assessed value of each property in the district on the date that the permanent rate was set necessarily would be equal to its frozen base. The increment would begin to accrue thereafter, as the urban renewal plan took effect. The urban renewal program, therefore, would be funded by the familiar process of extending the permanent rate against the increment and, under subsection (15) of Article XI, section 11, the taxes raised thereby would be used "exclusively to pay any indebtedness incurred for the redevelopment or urban renewal project."

Subsection (16) of Article XI, section 11, by contrast, provides the mechanism for funding *existing* urban renewal programs. It directs the legislature to enact laws ensuring that indebtedness incurred to carry out existing urban renewal projects is repaid, with the caveat that urban renewal taxes still must not exceed the "dollar limits" set out elsewhere in Measure 50. That subsection provides:

> "The Legislative Assembly shall enact laws that allow collection of ad valorem property taxes sufficient to pay, when due, indebtedness incurred to carry out urban renewal plans existing on December 5, 1996. These collections shall cease when the indebtedness is paid. Unless excepted from limitation under section 11b of this Article, as modified by subsection (11) of this section, nothing in this subsection shall be construed to remove ad valorem property taxes levied against the increase from the dollar limits in paragraph (b) of subsection (11) of this section."[12]

Or Const, Art XI, § 11(16).

---

[12] Subsection (16) effectively adopts this court's holding in *City of Portland v. Smith*, 314 Or 178, 192, 838 P2d 568 (1992). In *Smith*, the City of Portland brought an action, soon after the adoption of Measure 5, challenging the application of the Measure 5 limits to urban renewal taxes. The city contended that taxes imposed under Article IX, section 1c, to pay urban renewal indebtedness were, in the words of Measure 5, Or Const, Art XI, § 11B(3)(a), "taxes imposed to pay the principal and interest on bonded indebtedness authorized by a specific provision of this Constitution" and, therefore, exempt from the Measure 5 limits. This court held to the contrary, on the ground that Article IX, section 1c, does not specifically authorize urban renewal agencies to incur bonded indebtedness.

Paragraph (b) of subsection (11) of Article XI, section 11, provides, in turn, as follows:

"The $5 (public school system) and $10 (other government) limits on property taxes per $1000 of real market value described in subsection (1) of section 11b of this Article shall be determined on the basis of property taxes imposed in each geographic area taxed by the same local taxing districts."

Pursuant to the foregoing delegation of authority, the legislature that referred Measure 50 to the voters enacted legislation that, among other things, effectively grants urban renewal agencies limited taxing authority. Those agencies are permitted to impose a "special levy" to fund urban renewal programs existing before December 6, 1996. ORS 457.010(5)(a) (defining "existing urban renewal plan" as one that existed on December 6, 1996, the effective date of Measure 47); ORS 457.435(1) (authorizing special levies to pay indebtedness incurred for existing urban renewal plans). The special levy authority allows an urban renewal agency to make up for the shortfall caused by the Measure 50 reductions in assessed value and taxes. For purposes of Measure 5 and applicable statutes, special levies are treated as taxes for "government operations other than the public school system." OAR 150-457.440(9)(4)(d)(D); OAR 150-457.440(9)(5)(c)(F); OAR 150-457.440(9)(6)(e)(D).

Second, the statutory scheme provides taxing districts in which existing urban renewal areas are located with an alternative to the permanent rate provided for in Article XI, section 11(3)(b). As discussed above, a district's constitutional permanent rate does not generate sufficient funds to pay existing urban renewal indebtedness. The legislature therefore created a substitute, "statutory rate limit" for tax years after 1997-98, for taxing districts in which urban renewal areas exist. ORS 310.236(4)(a) and (b). Simply stated, that statutory rate is calculated in a manner similar to the constitutional permanent rate, but taxes are divided by the frozen base, rather than by the entire assessed value of the property, as required by Article XI, section 11(3)(b). ORS 310.236(4)(b); ORS 310.232. As in the pre-Measure 50 scheme, excluding the increment in calculating the statutory tax rate and then imposing that rate on the assessed value of

property in the district again results in the generation of "excess" funds (that is, funds in excess of the district's operating taxes), which are used to pay existing urban renewal indebtedness.

In addition to the foregoing, the 1997 Legislature amended the procedures for assessing compliance with applicable constitutional limits and for collecting taxes to pay urban renewal indebtedness. The procedure that was in place during the tax year at issue in this case, and that remains in place today, generally is as follows: Each taxing district files a written notice with the assessor certifying, among other things, its ad valorem property tax rate to be imposed on properties within the district, which must be within either the constitutional or statutory permanent rate limit. ORS 310.060(2)(a). That notice must be accompanied by a validly adopted ordinance or resolution[13] designating the taxes as either subject to or not subject to the Measure 5 limits and "identified by the categories set forth in ORS 310.150." ORS 310.060(1). In addition, the notice itself must list which rates are subject to the Measure 5 limits, identified by the categories of taxes set out in ORS 310.150. ORS 310.060(3)(a).

ORS 310.150, in turn, generally restates the Measure 5 categories of taxes, *viz.*, school, other government, and exempt bonded indebtedness. ORS 310.150(1)(a) to (c). Notably, however, ORS 310.150(7) expressly directs each taxing district to characterize its tax rates without regard to the fact that part of the taxes raised as a result of application of that rate to the entire assessed value, including the increment, will be used to fund urban renewal:

> "The determination of the appropriate category for an item of tax is based on the tax as certified by the taxing district under ORS 310.060 and not based on the tax imposed on the urban renewal increment as described in ORS chapter 457."

In addition, if a taxing district incorrectly categorizes the taxes as subject to or not subject to the Measure 5 limits, ORS

---

[13] ORS 310.145 authorizes units of local government to adopt such ordinances and resolutions.

310.070 directs the Department of Revenue to so notify the taxing district and the assessor, and then requires the assessor to extend the taxes on the rolls in a manner that is consistent with the constitution. ORS 310.070(1). That statute provides, further, that taxes are categorized incorrectly only if the taxing district does not have statutory authority to impose a tax in a particular category or if the Oregon Tax Court or this court has determined that the correct manner for categorizing the tax is different. ORS 310.070(2).

The assessor synthesizes the notices filed by all the taxing districts in the county into "code areas," which represent "all of the various combinations of taxing districts * * * in which a piece of property was located in the county * * *." ORS 310.147(1). For each code area, the assessor computes a tentative consolidated ad valorem property tax rate, which is the sum of all the rates identified on the notices as being within each category set out in ORS 310.150. ORS 310.090; ORS 310.147(2). The assessor then determines if the amount of tax that will be imposed on the properties in each category under the tentative consolidated ad valorem property tax rate is within the applicable constitutional limits and, if the amount in either or both of the categories is not within the limits, then the assessor compresses all the rates in the affected category proportionately to ensure compliance with those limits. ORS 310.150(3) to (6). The assessor thereby arrives at a consolidated tax billing rate, which ultimately serves as the basis for the tax statement sent out to each property owner. ORS 310.153; ORS 311.105 to ORS 311.115.

Meanwhile, the urban renewal agency notifies the assessor of the amount of money that needs to be raised to pay urban renewal indebtedness through the division of taxes and any special levy. ORS 457.440(2). To ensure that the amount requested through the division of taxes will be available for distribution to the urban renewal agency, the assessor also determines the maximum amount available for urban renewal by extending the consolidated tax billing rate for each code area in which an urban renewal area is located against the increment in that code area.[14] ORS 457.440(5).

---

[14] As noted, at the time when an urban renewal plan is approved, the county assessor for the area in which the urban renewal area is located prepares a

The assessor certifies that amount to the tax collector. ORS 457.440(6)(a). Once the taxes have been collected, the county treasurer distributes the taxes derived from the increment to the urban renewal agency and distributes the remaining funds to the taxing units that levied the taxes. *Id.*; ORS 310.390; ORS 310.395(5) and (6).

Under the foregoing statutory procedures, for the tax year in question, the "school" taxing districts in taxpayer's tax code area notified the assessor of their rates. The assessor then used the total amount of taxes generated by imposing those rates on the assessed value of the properties in the area to evaluate compliance with the Measure 5 limits for "school" taxes, and compressed, if necessary. Later, that total amount of collected taxes was divided, and the part of those taxes attributable to the urban renewal increment was disbursed to PDC. Thus, a part of the taxes that were levied by extending the school taxing districts' rates to the assessed value of taxpayer's property for the 1998-99 tax year ultimately was not used "to fund the public school system," at least as Measure 5 defines that phrase. However, that part was not placed in the "other than schools" category on taxpayer's property tax statement or treated as falling in that category for purposes of assessing compliance with the Measure 5 ad valorem property tax limits. The issue in this case is whether Measure 5, Measure 50, or both, required the assessor to treat that part as "revenue [dedicated] to fund government operations other than the public school system."

Measure 5 was an initiative measure, while Measure 50 was referred to the voters by the legislature. When we interpret either initiated or referred constitutional provisions, we attempt to discern the intent of the voters. *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 56-57, 11 P3d 228 (2000). That is so because, "with respect to [such] provisions, it is the people's understanding and intended meaning of the provision in question * * * that are critical to [this court's] analysis." *Id.* at 57. The best evidence of the voters' intent is

---

certified statement of the total assessed value of all the taxable real property contained in the urban renewal area in the county. ORS 457.430(1). That certified statement, as adjusted to account for changes in assessed value under Measure 50, ORS 457.430(6)(b), then provides the base from which the increment is calculated. ORS 457.440(4).

the text of the provision itself. *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559, 871 P2d 106 (1994); *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378, 851 P2d 595 (1993). If the voters' intent is clear after consideration of text and context, then the court's inquiry is over. *Ecumenical Ministries*, 318 Or at 559. The court, however, will not lightly conclude that the text is so clear that further inquiry is unnecessary. If any doubt remains, the court will consider the history of an initiated or referred constitutional provision in an effort to resolve the matter. *Id.*

As noted, taxpayer's principal argument focuses on the wording of Article XI, section 11b(1). We, too, start with that section. The first sentence of section 11b(1) requires the "separat[ion]" of "taxes" into categories. It provides:

"[T]axes imposed upon any property shall be separated into two categories: One which dedicates revenues raised specifically to fund the public school system and one which dedicates revenues raised to fund government operations other than the public school system."

Taxpayer contends that that wording unambiguously requires the assessor to evaluate compliance with the Measure 5 limits by considering the ultimate use to which the tax revenues will be put, regardless of the character of the taxing district whose rate was extended to generate those revenues.

■ We agree with taxpayer that the plain wording of the first sentence of subsection (1) indicates that it is the *taxes* imposed, and not particular taxing districts, that are to be separated into categories and, accordingly, that it is the rates derived by reference to those taxes, and not the rates of particular taxing districts generally, that are to be limited. The last sentence of subsection (1) confirms that interpretation by setting out, effectively, a definition of property tax revenues "raised specifically to fund the public school system." That sentence provides:

"Property tax revenues are deemed to be dedicated to funding the public school system if the revenues *are to be used exclusively* for educational services, including support

services, provided by some unit of government, at any level from pre-kindergarten through graduate training."

(Emphasis added.)

The emphasis in both the foregoing sentences is on the taxes themselves, the purpose to which those taxes are dedicated, and the use to which those taxes are to be put. It also is noteworthy that subsection (1) does not refer to the taxing districts that impose those taxes, except to the extent that it refers indirectly to those districts that *use* the taxes dedicated to educational services.

In spite of the foregoing, the Tax Court concluded, essentially, that other text in Article XI, section 11b, dictates a different conclusion. That court pointed to subsection (4) of Article XI, section 11b, which provides that, in the event that property taxes "exceed the limitation imposed on *either category of taxing units* defined in subsection (1) * * * the taxes imposed upon such property by *the taxing units in that category* shall be reduced evenly by the percentage necessary to meet the limitation for that category." (Emphasis added.) Relying in part on its earlier opinion in *Glenn v. Morrow Cty. Unified Recreation Dist.*, 14 OTR 344 (1998), the Tax Court concluded that the foregoing provision demonstrates that "the constitution's emphasis is on the governmental unit categorizing the tax and not on the use of the tax." *Shilo Inn*, 15 OTR at 42. In a similar vein, the court concluded that, " '[a]s enacted by the people, section 11b evidences an intent to limit the taxes imposed by each category based upon the function of the unit of government imposing the tax.' " *Id.* (quoting *Glenn*, 14 OTR at 352).

The Tax Court had attempted to reconcile the different wording (*i.e.*, "taxes," "revenues," and "taxing units") in subsections (1) and (4) in its earlier case, *Glenn*. In that case, the court stated that the wording of subsection (4) suggests that every taxing district falls into one of the two ("school" and "other") Measure 5 categories and the limitation, therefore, is on the category of taxing unit. 14 OTR at 351. The Tax Court in *Glenn* acknowledged that that interpretation was "somewhat at variance with the language in subsection (1)" but reasoned that, in light of the fact that Measure 5 provides no mechanism for tracking actual expenditures of tax dollars,

the limitations on taxes in Measure 5 must be based on their *intended* use. *Id.* It follows, according to the Tax Court, that the voters must have presumed an identity between the category or function of a taxing district and the purpose for which the taxes are raised by that taxing district.[15] *Id.* at 352.

As a starting point, we agree with the Tax Court that, in employing different phraseology in subsections (1) and (4), the voters well may have *assumed* an identity between the function of the taxing district imposing a tax and the use to which that tax will be put. However, in the case of taxes raised for urban renewal by extending a school taxing district's rate to the increment, there is no such identity in fact.

In light of the statutory scheme that was in effect when Measure 5 was adopted, and in light of the present constitutional and statutory scheme, we cannot conclude that taxes levied on the increment to fund urban renewal were, or are, "dedicated to funding the public school system" or "used exclusively for educational services," regardless of the function of the taxing district whose rate was used to generate the tax. The tax rates of school taxing districts, together with the rates of all the other taxing districts in an urban renewal area, have always been used to calculate the amount of taxes to be paid for urban renewal purposes. *Former* ORS 457.440(4) (1989), in place when Measure 5 was adopted, directed that the taxes so generated "shall be used to pay the principal and interest or indebtedness incurred by the [urban renewal] agency to finance or refinance the carrying out of the urban renewal plan." Moreover, Measure 50 placed a similar mandate in the constitution. Under Article XI, section 11(15), taxes on the increment expressly are dedicated "exclusively to pay any indebtedness incurred for the redevelopment or urban renewal project." Put differently, those directives affirmatively establish that taxes on the increment that are based on the extension of a school taxing district's rate have not been, and are not, "dedicated to funding the

---

[15] On that basis, the court upheld the constitutionality of ORS 310.355, which permits the categorization of a particular, voter-approved levy as either dedicated to funding the public school system or not, depending on the principal function of the governmental unit imposing the tax, unless the sole purpose of the levy is for a use in the other category. *Glenn*, 14 OTR at 352.

public school system," as Measure 5 defines that latter phrase.

Measure 5 itself contains no reference to urban renewal. It may be that, in adopting that measure, the voters did not anticipate a situation in which, as we have shown, there is a lack of identity between the function of the taxing district and the use to which at least part of the tax derived from extending that taxing district's rate is put. Indeed, we may assume that the disparate wording of subsections (1) and (4) arose out of an expectation that the principal function of a taxing district always would be identical to the use made of a tax generated by extending that district's rate. But it does not follow that, in a case in which there is no such identity, the voters intended the function of the taxing district imposing the tax, rather than the intended use of the tax, to determine the appropriate category for evaluating compliance with the Measure 5 limits.

This court has stated that the "basic directive" of Measure 5 is to "limit[ ] the taxes that may be imposed on any property by limiting the tax rates." *Coalition for Equit. School Fund. v. State of Oregon*, 311 Or 300, 310, 811 P2d 116 (1991). Thus, the limits themselves are featured prominently—they are set out at the beginning of the measure, in subsection (1) of Article XI, section 11b, and provide its foundation. Essential to the implementation of those limits are the categories to which they apply. In keeping with that position of prominence, subsection (1) is drafted in specific terms, even to the point that it contains an explanation of the categories and a definition of one of them, *viz.*, property tax revenues "dedicated to funding the public school system."

Subsection (4), by contrast, merely provides a procedural mechanism—compression—for ensuring that the limits on rates of taxation set out in subsection (1) are not exceeded. The subsection refers to and is dependent on "the limitation imposed on either category of taxing units *defined in subsection (1)*." (Emphasis added.) Subsection (1) does not "define" categories of taxing units. Thus, in spite of its use of the words "taxing units" rather than "taxes," that reference to "either category * * * in subsection (1)" only can be read to refer to the two categories that actually are labeled as such in

subsection (1), *viz.*, the category *of taxes* dedicated to funding the public school system, and the category *of taxes* dedicated to funding the rest of government. The cross-reference in subsection (4) shows that we must turn to subsection (1) for insight concerning the parameters of the pertinent categories, and not vice versa. As we have explained, when the inquiry is made in that way, it is clear that taxes devoted to urban renewal do not fall within the description of use for the public school system found in subsection (1).

We recognize that the description of the compression scheme in subsection (4) is not a perfect analytical fit. Specifically, that subsection requires the even reduction of "the taxes imposed upon * * * property [on which the taxes exceed the Measure 5 limits] by the taxing units in that category * * * by the percentage necessary to meet the limitation for that category." Further, it provides that the "percentage used to reduce the taxes imposed shall be calculated separately for each category and may vary from property to property within the same taxing unit." That wording appears to assume that the taxing district's rate would be reduced as a whole and then applied to the entire assessed value. The wording does not address different reduction percentages for the frozen base and for the increment, or the reduction of one but not the other, either of which might become necessary in the event that the school and other-government limits within an urban renewal area are exceeded to varying degrees, or in the event that one limit is exceeded but the other is not.

Having noted that seeming anomaly in subsection (4), however, we nevertheless conclude that the wording of that subsection provides no basis for overriding the clear import of the wording of subsection (1), nor does it otherwise justify a contrary interpretation of Measure 5's categories.

■ Based on the foregoing, we conclude that, in a case in which there is an arguable inconsistency between the purpose for which a tax is raised and the function of the taxing district whose rate is the source of the tax, subsection (1), which describes the categories in terms of the purpose of the tax, controls. That is, in adopting section 11b, the voters limited taxes according to their intended use, not according to

the principal function of the taxing district whose rate generated those taxes.[16]

■ Having concluded that Measure 5, standing alone, requires the categorization of urban renewal taxes according to their intended use, we examine whether any provision in Measure 50 signals the voters' intent to alter that scheme.

Measure 50 contains three references to categories of taxing districts, all of which are found in subsection (11)(c)(B) of Article XI, section 11. That subsection provides:

> "If property taxes exceed the limitations imposed *under either category of local taxing district* under paragraph (b) of this subsection:
>
> "(i) Any local option ad valorem property taxes imposed under this subsection shall be proportionally reduced by those *local taxing districts within the category* that is imposing the local option ad valorem property taxes; and
>
> "(ii) After local option ad valorem property taxes have been eliminated, all other ad valorem property taxes shall be proportionally reduced by *those taxing districts within the category*, until the limits are no longer exceeded."

(Emphasis added.) As is evident from the foregoing, all three references in Measure 50 to categories of taxing districts are contained in the part of that constitutional amendment dealing with compression of property taxes in the event that those taxes exceed the Measure 5 limits. The Measure 50 compression provisions do not modify the compression procedure set out in Measure 5, except to the extent that they ensure that local option taxes that are authorized separately by Measure 50 also are included in the procedure. Under the circumstances, we conclude that the fact that subsection (11) of Measure 50 is consistent with subsection (4) of Measure 5 is no evidence of the voters' intent to change the directive in subsection (1) of Measure 5 to limit taxes according to their intended purpose.

---

[16] As noted above, at n 10, the Attorney General effectively came to the same conclusion at the time that Measure 5 was adopted, as did the Department of Revenue in thereafter adopting implementing regulations, when designating that urban renewal taxes were to be treated as "other government" for purposes of the Measure 5 limits.

The Tax Court found support for its contrary conclusion in another paragraph of Article XI, section 11(11), as well as in Article XI, section 11(15), and Article XI, section 11(16). For the reasons that follow, we conclude that, in each case, the Tax Court's reliance was misplaced.

Article XI, section 11(11)(b), provides:

"The $5 (public school system) and $10 (other government) limits on property taxes per $1,000 of real market value described in subsection (1) of section 11b of this Article shall be determined on the basis of property taxes imposed in each geographic area taxed by the same local taxing districts."

With regard to that provision, the Tax Court stated:

"[Section 11(11)(b)] uses terms indicating that the limits of 11b are based on the taxes imposed, not the taxes expended. Specifically, section 11(11)(b) states that the limits 'shall be determined on the basis of property *tax imposed* in each geographic area taxed by the same local *taxing districts.*' * * * Although section 11b obviously contemplated that taxes would be used for the purposes as categorized, it contains no mechanism for ascertaining or verifying the actual expenditure of taxes. It provides only for the categorization at the time of imposition. Consequently, if taxes are properly categorized and the rate imposed in each category is within the limits of section 11b, that is the end of the 11b inquiry."

*Shilo Inn*, 15 OTR at 44 (emphasis added by Tax Court).

We find the Tax Court's reliance on the fact that neither Measure 5 nor Measure 50 provides a "mechanism for ascertaining or verifying the actual expenditure of taxes" to be something of a *non sequitur*. Both measures are tax limitation provisions. Certainly, one need not trace every dollar spent by a taxing district to see that taxes on the increment (no matter which taxing district's tax rate was extended to raise them) that are distributed to an urban renewal agency to pay for urban renewal projects are not "raised specifically to fund the public school system."

Turning to the essence of the Tax Court's analysis of subsection (11)(b), we observe that, in the material quoted above, the court focused on the reference in subsection (11)(b)

to "taxes imposed" when describing how compliance with the Measure 5 limits should be evaluated. Based on that wording, the court determined that each taxing district must categorize its tax rate as either "school" or "other government" at the time that it is imposed. In the Tax Court's view, the inquiry is over at that point: A statutory scheme that allows some urban renewal taxes to be treated as "dedicated to funding the public school system" does not violate the constitution. The unspoken premise on which that ultimate conclusion is based is that a taxing district cannot "impose" taxes for more than one purpose. Therefore, the Tax Court seems to have reasoned, taxes "imposed" on a property by application of a school taxing district's tax rate to a property must be categorized as being dedicated to the public school system, even if the part that is imposed on the increment is dedicated to urban renewal.

The problem with the foregoing reasoning is that it lacks a textual predicate. Nothing in the text of subsection (11)(b) suggests that taxes that are imposed by a local taxing district for two different purposes cannot be categorized separately. That paragraph merely provides that the applicable limits are to be "determined on the basis of property taxes imposed in each geographic area taxed by the same local taxing districts." Consistent with that approach, in a geographic area that includes an urban renewal district, compliance with the "$5 (public school system)" limit is to be determined on the basis of taxes imposed on the frozen base by the same school taxing districts. Similarly, compliance with the "$10 (other government)" limit is to be determined on the basis of taxes imposed on the increment by the same local taxing districts, some of which also are schools.

We also observe that the wording of subsection (11)(b) of Measure 50 is virtually identical to that used in subsection (1) of Measure 5. Measure 5 requires that *"taxes imposed* upon any property shall be separated into two categories * * *" according to the purpose for which they are raised. Or Const, Art XI, § 11b(1). Under Measure 50, it still is the taxes themselves, and not the rates of particular taxing districts, that are subject to the school and other government limits: The "limits * * * shall be determined on the basis of *property taxes imposed* * * *." Or Const, Art XI, § 11(11)(b)

(emphasis added). In addition, Measure 50 does not purport to redefine the Measure 5 categories; instead, it refers to the "limits * * * described in subsection (1) of section 11b of this Article," *i.e.*, the Measure 5 limits. *Id.* Because subsection (11)(b) of Measure 50 is not inconsistent with subsection (1) of Measure 5, it follows that the reference in subsection (11)(b) to "taxes imposed" does not reflect the voters' intent to change the way in which urban renewal taxes are categorized for purposes of assessing compliance with the Measure 5 limits.

The Tax Court also concluded that Article XI, section 11(15), of the Oregon Constitution, suggests that property taxes are to be categorized according to the function of the taxing district. That subsection provides:

> "If ad valorem property taxes are divided as provided in section 1c, Article IX of this Constitution, in order to fund a redevelopment or urban renewal project, then notwithstanding subsection (1) of this section, the ad valorem property taxes levied against the increase shall be used exclusively to pay any indebtedness incurred for the redevelopment or urban renewal project."

With regard to that provision, the Tax Court stated:

> "When read in light of the issue before the court, this provision clearly affirms that taxes will continue to be divided as permitted by section 1c, Article IX of the Oregon Constitution to fund urban renewal projects. To avoid this result, section 11b or section 11 would have to indicate that a school's tax rate is only to be applied to the frozen value. There is no such language anywhere in the constitution.[2]

---

> "[2] It is important to note that because urban renewal agencies do not levy taxes, such a result would leave urban renewal districts without funds to meet their obligations."

*Shilo Inn*, 15 OTR at 43.

It is, of course, beyond dispute that subsection (15) affirms that property taxes may continue to be divided as provided in Article IX, section 1c. As we understand taxpayer's arguments, however, taxpayer never has contended that either Measure 5 or Measure 50 changed the way that

taxes are to be divided for urban renewal. Moreover, the Tax Court's statement concerning the failure of either Measure 5 or Measure 50 to specify that schools' tax rates apply only to the frozen base is another *non sequitur*. The categorization of property taxes for Measure 5 purposes is a process entirely separate from the division of taxes for urban renewal funding. In sum, Article XI, section 11(15), does not support the Tax Court's analysis.

Finally, the Tax Court turned to subsection (16) of Article XI, section 11, which expressly authorizes the legislature to enact laws ensuring that existing urban renewal obligations are paid. That section concludes:

"Unless excepted from limitation under section 11b of the Article, as modified by subsection (11) of this section, nothing in this subsection shall be construed to remove ad valorem property taxes levied against the increase from the dollar limits in paragraph(b) of subsection (11) of this section."

The Tax Court stated that the foregoing

"indicates that any * * * taxes imposed [to pay urban renewal debts], 'unless excepted from limitation under section 11b,' remain subject to the limits of section 11b. Hence, taxes imposed 'against the increase' are not exempted from 'the dollar limits' of section 11b. Section 11b does not refer to just the limit on taxes for government operations other than schools. Use of the plural 'limits' refers both to the $5 per $1,000 limit for public schools and to the $10 per $1,000 limit for governmental operations other than schools. This evidences an intent that such limits are applied to the categories as made by the taxing districts when the taxes are imposed."

*Shilo Inn*, 15 OTR at 44.

Respondents make the same point. They contend that the reference to the plural "limits" in subsection (16), rather than the singular "limit," clearly means that the voters intended that urban renewal taxes could be subject *both* to the school and to the "other government" limits. According to respondents, had the voters intended urban renewal taxes to be treated exclusively as "other government" for purposes of the Measure 5 limits (as modified by Measure 50), Measure

50 would have referred only to the single other-government limit, either specifically or by using the singular word "limit."

*Amici* elaborate on the foregoing argument by contending that the history of the House Joint Resolution that eventually was referred to the voters as Measure 50 shows that the legislature made a deliberate choice to include the plural word "limits," rather than the singular "limit," in subsection (16) and that that choice reflects the legislature's intent to subject urban renewal taxes to both the school and other government limits.

Along the same lines as the foregoing arguments of the parties, there is one other aspect of the "dollar limits" phrase in subsection (16) that warrants closer inspection. The last sentence of that subsection provides that, unless excepted from limitation under "section 11b of this Article, as modified by subsection 11 of this section" (that is, under *Measure 5*, as modified), urban renewal taxes remain subject to "the dollar limits in paragraph (b) of subsection (11) of this section," that is, Measure 50. As discussed above, "paragraph (b) of subsection (11)" includes a shorthand reference to the Measure 5 limits: "The $5 (public school system) and $10 (other government) limits * * *."

Under ordinary rules of construction, the use of two different phrases in the same subsection to refer to the limits is presumed to be intentional and suggests that the phrases refer to different kinds of limits. One plausible interpretation of the reference at the end of subsection (16) to "paragraph (b) of subsection (11) of this section" is that the Measure 50 limits are *combined* dollar limits, as respondents and *amici* contend and the Tax Court held, and the parenthetical notation of categories is included in subsection (11)(b) only for the purpose of identifying the source of each dollar cap.

To determine whether, in subjecting urban renewal taxes to the "dollar limits of paragraph (b) of subsection 11 of this section" rather than to the "other government" limit alone or to the Measure 5 limits, the voters intended to alter the way in which urban renewal taxes were treated under Measure 5, we turn to the methodology that this court set out

in *Ecumenical Ministries,* 318 Or at 559. That is, we first consider the text of the initiated or referred constitutional provision and its context. *Id.* If the voters' intent remains unclear after consideration of the text and context of the provision, then the court turns to its history. *Id.*

We first observe that neither subsection (11) nor any other provision of Measure 50 directly refers to a combined $15 limit. Instead, paragraph (b) of subsection (11) continues to refer to the dollar limits according to their categories: "The $5 (public school system) and $10 (other government) limits on property taxes per $1000 of real market value described in subsection (1) of section 11b of this Article * * *." Or Const, Art XI, § 11(11)(b). Moreover, that paragraph provides that those limits are "described in subsection (1) of section 11b of this Article." That suggests that Measure 50 imports the Measure 5 limits in their entirety and that the category references in subsection (11)(b) are not merely parenthetical explanations intended only to identify the source of each dollar cap but, rather, are a shorthand reaffirmance of the Measure 5 limits.

Context also provides an indication that the use of the phrase "dollar limits" in subsection (16) does not represent a manifestation of the voters' intent to change the way urban renewal taxes are treated. Subsection (6) of Article XI, section 11, is similar to subsection (16), inasmuch as it uses the plural word "limitations" when limiting taxes covered by that subsection. Subsection (6) specifies that "[a]d valorem property taxes described in this subsection shall be subject to the *limitations* imposed under section 11b of this Article, as modified by subsection (11) of this section." Or Const, Art XI, § 11(6)(b) (emphasis added). The phrase "taxes described in this subsection" in subsection (6) refers to the "ad valorem property tax of a local taxing district, *other than a * * * school district, that is used to support a hospital facility.*" Or Const, Art XI, § (6)(a) (emphasis added).

It is incontrovertible, under any reading of the pertinent provisions of Measure 5 and Measure 50, that a tax imposed by a taxing district *other than a school district,* used to support a *hospital facility* (clearly a nonschool purpose), is a tax "raised to fund government operations other than the

public school system." It cannot be seen as a tax "raised specifically to fund the public school system." Under that circumstance, it is apparent that the provision in Article XI, section 11(6)(b), subjecting that tax to the "limitations" (plural) of Measure 5, as modified, merely reflects a general intent not to exclude that tax from the Measure 5 limits, and does not reflect a conscious decision on the part of the voters to broaden those categories beyond their defined parameters.

Similarly, nothing in subsection (16) of Article XI, section 11, suggests that the last sentence of that subsection is anything more than a limitation on the legislature's authority to enact laws protecting existing urban renewal programs. That is to say, it is more likely that the voters intended, by that sentence, to preclude the legislature from exempting urban renewal taxes from the Measure 5 limits as a means to ensure that existing urban renewal indebtedness is paid.

As is clear from the foregoing, our analysis of the text and context of the last section of subsection (16) suggests that the reference to the "dollar limits" does not manifest the voters' intent to subject urban renewal taxes generated by extending the school taxing districts' tax rate to the increment to the five dollar "school system" limit on property taxes. Nonetheless, as we have stated in the past, "caution is required in ending the analysis before considering the history of an initiated [or referred] constitutional provision." *Ecumenical Ministries*, 318 Or at 559 n 7; *see also Stranahan*, 331 Or at 57 (stating principle). We therefore choose to exercise our discretion by examining the history of Measure 50.

Contrary to *amici*'s suggestion, however, the history that we consider does not include early drafts of the legislative bill that later was referred to the people, nor does it include statements made by legislators in hearings on that matter. Those materials may be indicative of the *legislature's* intent in crafting Measure 50 but, as we stated most recently in *Stranahan*, 331 Or at 57, "it is the *people's* understanding and intended meaning of the provision in question—as to which the text and context are the most important clue—that is critical to our analysis." (Emphasis added.) It follows that only those materials that were presented to the public at

large help to elucidate the public's understanding of the measure and assist in our interpretation of the disputed provision. *Id.* at 64-65. Those materials include, *inter alia*, materials that are included in the Voters' Pamphlet, such as the ballot title, the explanatory statement, and the legislative argument in support. *See Ecumenical Ministries*, 318 Or at 559 n 8 (so stating). We turn to a review of those materials.

First, neither the ballot title summary of Measure 50, the explanatory statement, nor the Legislative Argument in Support mention urban renewal. Moreover, the ballot title summary and the explanatory statement imply that, under Measure 50, the Measure 5 limits remain unchanged. For example, the ballot title summary states that:

> "The measure retains the *existing* total property tax rate for all property taxes, including local option taxes but excluding taxes for bonds, at $5 per $1000 of value for schools and $10 per $1000 of value for nonschool government."

Official Voters' Pamphlet, Special Election, May 20, 1997, 5 (emphasis added). The Explanatory Statement contains a similar statement but includes a direct reference to Measure 5:

> "Retains *existing* property tax rate limitation of $5 per $1000 of value for schools and $10 per $1000 of value for nonschool government (1990 Measure 5)."

*Id.* at 7 (emphasis added).

Second, those materials prominently inform the voters that Measure 50 was intended to repeal and replace Measure 47, which, according to the Legislative Argument in Support, had "unintended consequences." *Id.* Measure 47, however, did not address urban renewal in any respect. Thus, the voters would not have had a reason even to suspect that Measure 50 would change the way in which urban renewal taxes would be treated. In short, nothing in the history establishes that, in adopting Measure 50 and, in subsection (16) of that measure, subjecting urban renewal taxes to the "dollar limits of paragraph (b) of subsection (11)," the voters intended to change the way that urban renewal taxes are to be categorized for purposes of assessing compliance with the Measure 5 limits.

In summary, the text of subsection (1) of Measure 5 provides that the limits set out in that subsection apply to taxes that are to be separated into categories according to the uses to which those taxes are dedicated. Nothing in the context of other provisions of Measure 5 alters that conclusion. Moreover, nothing in the later-enacted Measure 50 changes that method of categorization to a system in which the *function* of the taxing district imposing the tax, rather than the *use* to which the tax is dedicated, is the determinative factor in evaluating compliance with the Measure 5 limits.

 As noted, the problem in this case arises because certain parts of the statutory scheme that the legislature enacted to implement Measure 50 expressly direct the categorization of urban renewal taxes according to the function of the taxing district whose rate is used to generate the tax. Specifically, ORS 310.150(7) provides:

> "The determination of the appropriate category for an item of tax is based on the tax as certified by the taxing district under ORS 310.060 and not based on the tax imposed on the urban renewal increment as described in ORS chapter 457."

Thus, under that statute, the assessor treats all taxes generated by extending a school taxing district's tax rate to the assessed value of a property within an urban renewal area as being subject to the school system limit for purposes of assessing compliance with Measure 5. The Tax Court, based on its construction of the various provisions of Measure 5 and Measure 50, concluded that ORS 310.150(7) is consistent with the Oregon Constitution.

As is evident from the foregoing discussion, however, that conclusion was incorrect. The Oregon Constitution requires that the assignment of an item of tax to the "school" or "other government" category be based on the purpose to which that item of tax is dedicated. In an urban renewal area, only taxes on the frozen base specifically are dedicated to funding the public school system. Taxes on the increment, by contrast, regardless of which taxing district's ad valorem property tax rate is used to calculate their amount, are dedicated to pay indebtedness incurred for the redevelopment or

urban renewal project. Thus, for purposes of assessing compliance with the Measure 5 property tax limits, taxes on the increment, including those that are generated by extending a school taxing district's tax rate to the increment, are taxes that belong in the category that "dedicates revenues raised to fund government operations other than the public school system." Or Const, Art XI, § 11b(1). To the extent that ORS 310.150(7) is in conflict with that requirement, it is unconstitutional.

Notwithstanding any conflict with Article XI, section 11b(1), *amici* suggest that the legislature was within its authority to enact ORS 310.150(7). They contend, first, that the legislature's actions should be given deference because, in subsection (16), Measure 50 specifically calls for the legislature to adopt implementing legislation. Article XI, section 11(16), provides that:

> "The Legislative Assembly shall enact laws that allow collection of ad valorem property taxes sufficient to pay, when due, indebtedness incurred to carry out urban renewal plans existing on December 5, 1996."

*Amici* suggest that, under that grant of authority, the legislature "made a number of deliberate choices to ensure that urban renewal agencies would continue to receive the tax revenues necessary to carry out the [existing] urban renewal plans * * * includ[ing] making certain that the taxes were spread, for purposes of property tax limits, between both the $10 and the $5 limits." *Amici* also contend that the statutory scheme allowing urban renewal taxes to be treated in some cases as subject to the school system limit should be construed as constitutional because the same legislature that crafted Measure 50 also adopted its implementing legislation, which includes the provisions subjecting urban renewal taxes to the $5 school system tax limit if they are raised by extending a school taxing district's rate to the increment. For the reasons that follow, neither of those positions is persuasive.

It is true that the directive to the legislature in subsection (16) to "enact laws" to ensure the payment of urban renewal obligations purports to be a broad grant of authority to protect existing urban renewal funding in any way that the

legislature sees fit. Nevertheless, that authority expressly is made subject to the Measure 5 limits. The last sentence of subsection (16) provides:

> "[N]othing in this subsection shall be construed to remove ad valorem property taxes levied against the increase from the dollar limits in paragraph (b) of subsection (11) of this section."

Moreover, nothing elsewhere in the text of Measure 50 suggests that that amendment to the constitution was intended to change the way that the categories to which the Measure 5 limits apply are construed. As we already have discussed at length, the Measure 5 limits apply to categories of taxes according to the purpose to which those taxes are dedicated. Measure 50 neither directs the legislature, nor grants it the power, to enact laws that change that constitutional structure.

We also reject *amici*'s argument that ORS 310.150(7) is entitled, in effect, to a presumption of constitutionality, simply because it was drafted by the same legislature that crafted Measure 50 itself. This court considered a contention similar to *amici*'s in *State v. Kuhnhausen*, 201 Or 478, 266 P2d 698, *on reh'g* 201 Or 478, 272 P2d 225 (1954). In that case, the court was asked to consider whether a statute adopted pursuant to constitutional authority "defined" the relevant constitutional provision, such that compliance with the statute became equivalent to compliance with the constitutional provision. The court stated

> "[s]o long as the doctrine of separation of powers remains basic in our system, the ultimate power and duty of the courts to construe the constitution must rest with the courts alone. That power should not be lightly whittled away by any rule which recognizes the power of the legislature to authoritatively construe the constitution. * * *

> "It has been suggested that there is an exception to the general rule in the case of a contemporaneous legislative construction of the constitution. * * * Conceding, for the sake of argument, that the legislature had power to bind this court as to the construction of the constitution, it would necessarily follow that the only constitutional provision which the legislature could 'construe and define' would be

the constitution which was in force at the time that the statute was enacted."

*Kuhnhausen*, 201 Or at 517-18.

The same reasoning applies in the present case. Even if the legislature had the power to construe and define Measure 50 through the statute at issue in this case, it had no such power with respect to *Measure 5*. Therefore, even if the legislature believed when it referred Measure 50 to the voters that that measure, if adopted, would permit the categorization of taxes according to the principal function of the taxing district whose rate was used to generate the tax, this court is not bound by that interpretation. We already have concluded that Measure 5 requires the categorization of taxes according to their dedicated purpose and that no provision of Measure 50 changes that method of categorization. The fact that the legislature that proposed Measure 50 to the people and enacted its implementing legislation might have held a different view does not inform our analysis of Measure 5 and, therefore, cannot dictate derivatively how we interpret Measure 50.

In summary, under Measure 5, for purposes of assessing compliance with the ad valorem property tax limits, taxes must be separated into two categories, "school system" and "other than schools," according to the use to which those taxes are dedicated. Taxes on the increment to fund urban renewal projects belong in the Measure 5 category that "dedicates revenues raised to fund government operations other than the public school system."

The decision of the Tax Court is reversed and the case is remanded to that court for further proceedings.