## IN THE OREGON TAX COURT
### REGULAR DIVISION

Nicholas J. URHAUSEN,
John McVickar and Kip Rice,
*Petitioners,*

*v.*

CITY OF EUGENE,
*Respondent.*

(TC 4692)

Gregory J. Howe, Portland, filed the motion and argued the cause for Plaintiffs (taxpayers).

Glenn Klein, Eugene, filed the motion and argued the cause for Defendant (the city).

Decision for Plaintiffs rendered February 16, 2006. Supplemental Decision relating to amount of relief due was issued April 4, 2006. An award of attorney fees and other costs was issued May 8, 2006.

**HENRY C. BREITHAUPT, Judge.**

## I. INTRODUCTION

This matter is before the court on stipulated facts and cross motions for summary judgment. Petitioners maintain that 93% of the proceeds of a voter approved levy of the City of Eugene (the city) must be accounted for in the "public school funding" category of Article XI, section 11b, of the Oregon Constitution (Measure 5), which was added to the constitution by initiative. Respondent argues that all proceeds of the levy were, and are, properly accounted for in the "other government" category of Measure 5. The difference in categorization is important because a substantial number of properties subject to the levy, including properties owned by petitioners, would have the benefit of Measure 5 tax limits if the levy or its proceeds are categorized as funding public schools, but not if the levy or its proceeds are categorized as funding other government services.

At oral argument, the parties agreed that ORS 310.155[1] applies to this case and petitioners conceded that they cannot prevail if that statute is constitutional. Given the

---

[1] All references to the Oregon Revised Statutes (ORS) are to the 2003 edition.

central importance to this case of the constitutionality of ORS 310.155, the court, with the consent of all parties, invited the Attorney General to submit a brief on all issues. The Attorney General did so and the parties had an opportunity to respond to that filing.

## II.  FACTS

The factual stipulation in this matter is incorporated by reference and may be summarized as follows:

A four-year local option levy (the levy) was adopted by the City Council of Eugene and referred to the voters. A majority of voters approved the levy. The levy authorized a property tax of $0.86 per $1,000 of assessed value. The levy stated that approximately seven percent of the proceeds were to be used by the city to provide services for youth. The remainder of the proceeds, approximately 93 percent, were stated to be, and were, provided under agreement to the Eugene and Bethel School Districts (the school districts) for several purposes: school-based instruction in music and physical education; school-based counseling; school-based nurse services; school-based library services; and high school or middle school athletics and student activities. In both the findings of the City Council made in connection with the resolution referring the levy to the voters, as well as the Voters' Pamphlet statements in support of the levy, it was stated that the services to be provided by the school districts would provide community-wide benefits and complement other services provided by the city. The resolution stated that the amount of the levy would be proportionately reduced if the Oregon legislature acted to increase the amount of funding for students within the school districts beyond the amount anticipated, as of June 2002, for the four-year period of the levy.

## III.  ISSUES

A.  Is ORS 310.155 consistent with Measure 5?

B.  How are the proceeds of the levy in question properly categorized for purposes of Measure 5?

## IV. DISCUSSION

ORS 310.155 provides, in relevant part:

"(1) For purposes of ORS 310.150, taxes are levied or imposed to fund the public school system if the taxes will be used exclusively for educational services, including support services, provided by any unit of government, at any level from prekindergarten through post-graduate training.

"(2) Taxes on property levied or imposed by a unit of government whose principal function is to provide educational services shall be considered to be dedicated to fund the public school system unless the sole purpose of a particular, voter approved levy is for other than educational services or support services as defined in this section.

"(3) Taxes on property levied or imposed by a unit of government whose principal function is to perform government operations other than educational services shall be considered to be dedicated to fund the public school system only if the sole purpose of a particular, voter approved levy is for educational services or support services as defined in this section."

The first step for the court is to construe the statute and determine how it applies to the facts of this case. That is not a difficult task. ORS 310.155, like so many important tax statutes, addresses categorization—the taxonomy of the tax regime in question. It speaks in the context of a general constitutional and statutory scheme in which revenues or taxes to fund the public school system are distinguished from those to fund government operations other than the public school system.

Subsection (1) of ORS 310.155 paraphrases a specific portion of Measure 5. It provides a solution to the categorization problem in cases where the revenues will be used exclusively to fund public schools. The second and third subsections appear to address situations where the "exclusive use" rule of the constitution and ORS 310.155(1) does not apply. Implicitly, that would be the case when taxes will be used for both school and other government purposes, that is when the levy has a mixed purpose. In such cases, the statute addresses the character of the unit of government involved and changes its focus from "taxes" to the "levy." In light of

*Shilo Inn v. Multnomah County,* 333 Or 101, 36 P3d 954 (2001), it is important to note, however, that, by the terms of ORS 310.155, the character of the governmental unit does not conclusively dictate the Measure 5 category into which the revenue belongs. Rather, the character of the governmental unit only clarifies which of two categorization rules for mixed purpose levies to use, *viz*:

　　1.　If the governmental unit is a school unit, the revenue is school revenue *unless* the *sole* purpose of the levy is for other than school services.

　　2.　If the governmental unit is not a school unit, the revenue is school revenue *only if* the *sole* purpose of the levy is for school services.

　　This case involves the second rule summarized immediately above and found in ORS 310.155(3). Because the governmental unit whose voters approved the levy here is not a school unit, under ORS 310.155(3), the levy must be categorized as for "other government" services unless its sole purpose was to fund public schools. The petitioners concede that the levy in question had two purposes, one of which, constituting approximately seven percent of the levy, was for "other government" services. It follows that if ORS 310.155(3) is consistent with Measure 5, petitioners cannot prevail.

　　Measure 5 provides:

"(1) During and after the fiscal year 1991-92, taxes imposed upon any property shall be separated into two categories: One which dedicates revenues raised specifically to fund the public school system and one which dedicates revenues raised to fund government operations other than the public school system. The taxes in each category shall be limited as set forth in the table which follows and these limits shall apply whether the taxes imposed on property are calculated on the basis of the value of that property or on some other basis:

[table not included]

"Property tax revenues are deemed to be dedicated to funding the public school system if the revenues are to be used exclusively for educational services, including support

services, provided by some unit of government, at any level from pre-kindergarten through post-graduate training."

Respondent argues that in the context of the voter approved levy at issue here, the revenues from the levy are "deemed to be dedicated to funding the public school system if the revenues are to be used exclusively for educational services." They continue to observe that because the purpose of the levy was not "exclusively" for school purposes, the constitution and statutory rules classify all revenue collected under the levy as for other government services.

The result that respondent urges upon the court is produced by ORS 310.155(3), but that result is not required by the constitutional language. The constitutional language states what categorization is appropriate if revenues have an exclusive use. However, it does not state what categorization is appropriate if the revenues have a mixed use. Accordingly, the statutory approach contained in ORS 310.155(2) and (3) is not consistent with Measure 5 and other statutes implementing Measure 5, or with *Shilo*.[2]

ORS 310.155(3) allocates all taxes imposed by a nonschool unit pursuant to a voter approved levy to the nonschool category, unless the sole purpose of the levy is to fund public schools. However, ORS 310.155(3) finds support in the constitutional text only in cases where a nonschool unit of government imposes taxes, which are, in fact, used exclusively for schools. Accordingly, there is no support in the constitutional text for the rule contained in ORS 310.155(3) as to categorization of mixed use levies. Similarly, ORS 310.155(2) states a rule that conclusively allocates to the "school" category all taxes imposed by a school unit under a voter approved levy unless the sole purpose of the levy is to fund other government purposes. As with ORS 310.155(3), ORS 310.155(2) finds no support in the constitutional text, which, like ORS 310.155(1), speaks only of exclusive use for schools.

Perhaps recognizing this, respondent and the Attorney General argue that categorization is to be undertaken at the level of the tax levy and in advance of actual

---

[2] Although this case directly implicates only ORS 310.155(3), the court considers it appropriate to discuss ORS 310.155(2) as well because it is a corollary of ORS 310.155(3) driven by the same construction of the constitutional text.

imposition of the taxes. Petitioners do not seriously contest the second of these points. That is wise, because any argument that the constitutional limits are to be applied after taxes are raised or spent would be unworkable. The categorization must be completed before actual imposition and collection of the tax because categorization can result in "compression," which will itself affect the amount of the tax collected and spent. *See Shilo*, 333 Or at 123.

However, petitioners vigorously attack the premise that categorization is done at the level of a total levy, with the directional signals of the statute pushing all revenues raised under a levy to one, and only one, of the constitutional categories. In that attack, petitioners place primary reliance on the fact that the constitutional languages refers not to "levies" but to "taxes" and "revenues." They also argue the matter has been settled by the Supreme Court in *Shilo*.

Respondent and the Attorney General make constructional arguments to support the "levy level" approach of the statute. They also argue that *Shilo* only addresses the special case of urban renewal taxation. As to matters of construction, petitioners have the much better argument. First, the constitutional language at issue never refers to a "levy" or "levies." Critical categorization is to occur, rather, in respect of "revenues" or "taxes."

Further, the opinion in *Shilo* supports petitioners on several points. First, the court in *Shilo* noted that the constitution refers to the taxes imposed and not, as the government then argued, to the nature of the particular taxing unit. 333 Or at 121-22. Similarly, here the constitution refers to the "taxes" imposed and not the "levy" under which they are imposed. Second, the court in *Shilo* noted that the relevant constitutional language of Measure 5 speaks to the purpose to which taxes are dedicated and the use to which they are to be put. *Id.* To the Supreme Court, purpose and intended use trump the character of the governmental unit imposing the tax. While the court was answering a particular question regarding the special features of urban renewal taxation, the stress placed by the court on the concepts of purpose and intended use strongly indicates that a more general application is warranted.

As the court specifically stated:

"[I]n adopting section 11b [Measure 5], the voters limited taxes according to their intended use, not according to the principal function of the taxing district whose rate generated those taxes."

333 Or at 121-22.

"The Oregon Constitution requires that the assignment of an item of tax to the 'school' or 'other government' category be based on the purpose to which that item of tax is dedicated."

333 Or at 131.

Although it could be argued that ORS 310.155(2) and (3) do not categorize by the principal function of a taxing district, the statutory "sole purpose" rule and how it is used will most often, if not always, dictate a result depending, in the first instance, on the principal function of the district levying the tax. If the taxing district is not a school unit, revenues will be "other government" except in the one instance where the sole purpose of the levy is school support. This court has so concluded. *Glenn v. Morrow Cty. Unified Recreation Dist.*, 14 OTR 344, 352 (1998). However, that result is inconsistent with the provisions of Measure 5, which contemplate that units of government other than school units may, in fact, provide educational services. That constitutional assumption is reflected in ORS 310.061(2)(b), which contemplates government units other than school districts supplying school services.

Most importantly, however, the Supreme Court in *Shilo* made it abundantly clear that "either/or" approaches of the type reflected in ORS 310.155(2) and (3) are not warranted. Speaking of this court's determination that each taxing district must categorize its tax rate as either "school" or "other government," the Supreme Court stated:

"The unspoken premise on which that ultimate conclusion is based is that a taxing district cannot 'impose' taxes for more than one purpose. * * * The problem with the foregoing reasoning is that it lacks a textual predicate. Nothing in subsection (11)(b) suggests that taxes that are imposed by a

local taxing district for two different purposes cannot be categorized separately."

333 Or at 124. Although those statements were made with reference to Article XI, section 11, paragraph (11)(b) (subsection (11)(b) of Measure 50) the court went on to observe that "[t]he wording of subsection (11)(b) of Measure 50 is virtually identical to that used in subsection (1) of Measure 5." *Id.* at 124.

It is with subsection (1) of Measure 5 that this court is now concerned.

"[I]n a case in which there is an arguable inconsistency between the purpose for which the tax is raised and the function of the taxing unit whose rate is the source of the tax, subsection (1) [of Measure 5] which describes the categories in terms of the purpose of the tax, controls."

*Id.* at 121. In this case, petitioners have alleged just such an inconsistency between the purpose of a portion of the levy and the function of the taxing unit imposing the tax. Accordingly, the court concludes that *Shilo* requires categorization by intended use.

That conclusion is bolstered by ORS 310.060, a sister statute to ORS 310.155, which contemplates that a local option tax is an "item," and paragraph (3)(b) of which provides:

"If an item described in subsection (2) of this section is allocable to more than one category described in ORS 310.150, the notice shall list separately the portion of each item allocable to each category."

ORS 310.060 evidences that the multipurpose rule set out in *Shilo* was actually contemplated by the legislature, if not included in ORS 310.155(2) or (3).

The court concludes that the constitution, statutes, and governing case law require allocation of the proceeds of levies among categories. Categorization at the levy level is not permitted. To the extent that ORS 310.155(2) and (3) are inconsistent with that rule, that is, to the extent that they

limit categorization of the proceeds of mixed use levies to only one category, they are unconstitutional.[3]

The foregoing leads to the question of what the intended uses were for the revenues from the levy in question and, therefore, the proper Measure 5 categorization of those revenues. Petitioners appear to concede that seven percent of the revenues are properly characterized as being for other government services. As to the remaining 93 percent of revenues, petitioners argue that the available evidence demonstrates that those revenues were imposed to "fund the public school system." Respondent maintains that the purpose of those expenditures was related to general city government and goals and that, therefore, that segment of the levy was, and is, properly categorized as being for "government operations other than the public school system."

The provisions of Measure 5 do not define in detail what is, or is not, considered an expenditure for the public school system. However, Measure 5 does indicate that funding for "educational services, including support services, provided by some unit of government at any level from pre-kindergarten through post-graduate study" is funding for the public school system.

ORS 310.155 provides, in part:

"(4) As used in this section, 'educational services' includes:

"(a) Establishment and maintenance of preschools, kindergartens, elementary schools, high schools, community colleges and institutions of higher education.

"(b) Establishment and maintenance of career schools, adult education programs, evening school programs and schools or facilities for the physically, mentally or emotionally disabled.

---

[3] The exclusive use rule of Measure 5 retains importance because the intended use of any portion of funds from a levy could serve both general government and school purposes. That would occur, for example, in the case of funding for a facility serving both educational and nonschool purposes. Such a situation is not presented in this case.

"(5)  As used in this section, 'support services' includes clerical, administrative, professional and managerial services, property maintenance, transportation, counseling, training and other services customarily performed in connection with the delivery of educational services.

"(6)  'Educational services' does not include community recreation programs, civic activities, public libraries, programs for custody or care of children or community welfare activities if those programs or activities are provided to the general public and not for the benefit of students or other participants in the programs and activities described in subsection (4) of this section."

Neither party argues that the foregoing definitions are inconsistent with the constitution as this court construed them in *Glenn*. 14 OTR at 348.

The question becomes whether the intended uses of the 93 percent "school portion" of the levy fit within the foregoing definition of educational services. Here, determination of intended use does not require speculation. ORS 280.080 requires that whenever a proposed local option tax is submitted to the voters, as was done here, the instrument pursuant to which an election is called must set forth the purpose for the levy. In this case, the election was called by an ordinance, which stated that the funds to be raised by the levy were:

"For funding the development of school-based music and physical education classes, school-based nurses, counselors and librarians, school-based athletics and student activities and city youth activities."

The findings accompanying the ordinance included the following:

"J.  A levy of $0.86/$1,000 of AV is expected to raise an average net amount of approximately $8.0 million per year for a total net levy of $31.5 million over the four year period. Funds generated by the levy should be distributed to the school districts based on the initial projections of assessed value and collection rates. The school district portion of the levy should be split between the districts based on their relative share of assessed value within the City of Eugene. Based on current projections the Eugene School District is expected to receive net revenues of approximately

$24.4 million over the 4 year term. The Bethel School District is expected to receive net revenues of approximately $4.6 million. The balance of the levy, approximately 7% of the total, would be retained by the City to support City managed activities.

"* * * * *

"L. It is the Council's intent that if the Legislature increases the amount of funding for students within the Eugene and Bethel school districts beyond the amount anticipated as of June 2002 for the four-year period, the amount of the levy should be proportionately reduced. Therefore, should the Legislature increase that funding, the City, as part of the annual budget process, shall levy less than $0.86 per $1,000 of assessed value."

Finding L was bound into the resolution passed by the City Council and approved by the voters.

The Voters' Pamphlet distributed to electors stated:

"Funds generated will be used to provide services to youth. Approximately 93% of the funds will be given to Eugene and Bethel school districts for several types of activities. Those school-based activities include school nurses, counselors and librarians, student activities and athletics, and elementary music and physical education. Funds retained by the City will be used to provide youth services such as the Summer Fun for all program. Charter and alternative schools will receive equitable amount of funds from school districts based on existing allocation formulas. The City and school districts will enter into intergovernmental agreements to ensure that levy funds are spent by the districts to benefit city residents to greatest extent possible. If the Legislature increases state per pupil funding beyond amounts anticipated in June 2002 (inflated to maintain equivalent services), then levy will be proportionately reduced. The proposed rate will raise approximately $7.2 million in 2003-2004, $7.6 million in 2004-2005, $8.1 million in 2005-2006, and $8.6 million in 2006-2007, for a total of approximately $31.5 million."

Considering the foregoing, the following observations may be made:

1. The activities funded by the 93 percent portion of the levy were to be school-based and not occurring in the community generally.

2. Although intergovernment agreements would attempt to ensure expenditures only for the benefit of city residents, it was contemplated that some benefit to nonresidents could occur. However, any nonresident beneficiaries of the school administered programs would be students.

3. Ninety-three percent of the funds were expected to go to school districts and 7 percent to the city for city managed activities.

4. If state funding for students in the school districts involved was increased at any time during the life of the levy over an assumed baseline of state support for students, the levy would be decreased.

This court has concluded in the past that where cocurricular activities such as sports, drama, and music "are conducted in the school context, they take on the character and color of education." *Glenn*, 14 OTR at 349.[4]

■ These points, considered together, indicate that the funds provided to the school districts by the city are for educational services within the meaning of ORS 310.155(4). There is every indication that the services provided will be for students in the school districts and not the public, or even the young public, generally. Therefore, the exception from the definition of educational services stated in ORS 310.155(6) for community, civic, and other general public programs does not apply. The programs are to be "school-based" and nothing in the record indicates that the services funded by the 93 percent increment will be made available to the public generally. Finally, the linkage of increased state funding for *students* to decreased levy amounts appears to foreclose any argument that the purpose of the 93 percent increment is anything but for educational services. Finally, the levy reduction provision

---

[4] This aspect of *Glenn*, as well as that discussed above regarding construction of ORS 310.155, remain authoritative for this court, even after *Shilo*. However, this court's analysis in *Glenn* of the constitutionality of ORS 310.155 and the categorization of revenues by type of taxing district cannot be considered to have survived *Shilo*.

is tied specifically to increased funding for students in the school districts.

■        Respondent argues that its general civic responsibilities and goals, for example with respect to health, safety, and culture, are advanced by the expenditures in question. However, that logic, if decisive, would render virtually meaningless the constitutional distinction between school funding and general government operations. Few would doubt that educational improvement generally results in civic improvement, as a majority of those who voted on the levy appear to have agreed. However, the voters who adopted Measure 5 imposed separate and strict constitutional limits on the actions of majorities, whether acting directly or through a legislative body. Those limits prevent such an equation of civic and educational benefit from operating here to permit educational purposes to be characterized as being those of government generally.

## V.   CONCLUSION

This case is continued for purposes of calculating the amount of relief due to petitioners and considering the other relief requested by petitioners.