Argued and submitted June 19, judgment of Tax Court affirmed August 31, 2006

# Nicholas J. URHAUSEN,
## John McVickar and Kip Rice,
*Respondents,*

*v.*

# CITY OF EUGENE,
*Appellant.*

# (TC 4692; SC S53391)

142 P3d 1023

Jerome Lidz, Harrang Long Gary Rudnick PC, argued the cause for appellant. With him on the briefs were Karla Alderman and Glenn Klein.

Gregory J. Howe, argued the cause and filed the brief for respondents.

Edward H. Trompke, of Jordan Schrader PC, filed the brief on behalf of *amicus curiae* Morrow County Unified Recreation District. Jeffrey G. Condit, Miller Nash LLP, filed the brief on behalf of *amicus curiae* Portland School District No 1J, Multnomah County (Portland Public Schools). Beth Ann Lori, City of Ashland, filed the brief on behalf of *amicus curiae* City of Ashland. Joe B. Richards, Luvass Cobb PC, filed the brief on behalf of *amici curiae* Eugene School District and Bethel School District.

DE MUNIZ, C. J.

## DE MUNIZ, C. J.

This property tax case is before the court on direct appeal from an Oregon Tax Court judgment. The issue presented is whether the City of Eugene's (city) categorization of revenues raised by a local option levy pursuant to ORS 310.155(3) was consistent with the tax limitations set out in Article XI, section 11b, of the Oregon Constitution (hereafter, Measure 5[1]). The Tax Court concluded that the city's revenue categorization was not consistent with Measure 5 requirements. In so holding, the Tax Court declared ORS 310.155(3) unconstitutional and held that Measure 5 required that revenues be categorized according to their intended use and the purpose for which those revenues were raised. *Urhausen v. City of Eugene*, 18 OTR 395 (2006). For the reasons that follow, we affirm the Tax Court judgment.

The relevant facts are undisputed. Taxpayers Urhausen, McVickar, and Rice (collectively, taxpayers) are resident taxpayers of the city. In 2002, the Eugene City Council passed a resolution calling for a four-year local option tax levy (levy) within the city and referred the levy to city voters for approval. The proposed levy was designed to institute a new property tax of $0.86 per $1,000 of assessed real-market property value within the area. Over its proposed four-year duration, the levy was expected to raise a total of $31.5 million. Under the levy's terms, seven percent of those proceeds, approximately $2.2 million, would be used by the city to provide services for youth. The remaining 93 percent, approximately $29.3 million, was slated to go to the Eugene and Bethel school districts (school districts) for a number of specific purposes: school-based instruction in music and physical education; school-based counseling; school-based nurse services; school-based library services; and high school or middle school athletics and student activities. The resolution referring the levy to voters made clear that the amount of the levy would be proportionately reduced if the Oregon Legislative Assembly acted to increase the amount of funding

---

[1] The voters adopted Measure 5 as an amendment to the Oregon Constitution in 1990.

for students within the school districts beyond the amount anticipated for the four-year period of the levy.[2]

By its terms, the bulk of the levy was aimed at school funding. However, the city did not categorize the anticipated levy revenues as public school funds. Instead, it categorized those revenues as funds for "government operations other than the public school system."

Measure 5 provides, in part:

"(1) During and after the fiscal year 1991-92, taxes imposed upon any property shall be separated into two categories: One which dedicates revenues raised specifically to fund the public school system and one which dedicates revenues raised to fund government operations other than the public school system. The taxes in each category shall be limited as set forth in the table which follows and these limits shall apply whether the taxes imposed on property are calculated on the basis of the value of that property or on some other basis:

"MAXIMUM ALLOWABLE TAXES

"For Each $1000.00 of Property's Real Market Value

| "Fiscal Year | School System | Other than Schools |
| --- | --- | --- |
| 1991-1992 | $15.00 | $10.00 |
| 1992-1993 | $12.50 | $10.00 |
| 1993-1994 | $10.00 | $10.00 |
| 1994-1995 | $ 7.50 | $10.00 |
| 1995-1996 and thereafter | $ 5.00 | $10.00 |

"Property tax revenues are deemed to be dedicated to funding the public school system *if the revenues are to be used exclusively for educational services*, including support

---

[2] Specifically, Resolution No. 4737 provided, in part:

"It is the Council's intent that if the Legislature increases the amount of funding for students within the Eugene and Bethel school districts beyond the amount anticipated as of June 2002 for the four-year period, the amount of the levy should be proportionately reduced. Therefore, should the Legislature increase that funding, the City, as part of the annual budget process, shall levy less than $0.86 per $1,000 of assessed value."

services, provided by some unit of government, at any level from pre-kindergarten through post-graduate training."

Or Const, Art XI, § 11b (emphasis added).

The city based its categorization of the funds in question on Measure 5's implementing statute, ORS 310.155; specifically, subsection (3) of that statute. Among other things, ORS 310.155 defines taxes levied for public school funding as those used "exclusively" for educational services:

"(1)  For purposes of ORS 310.150, taxes are levied or imposed to fund the public school system *if the taxes will be used exclusively for educational services,* including support services, provided by any unit of government, at any level from pre-kindergarten through post-graduate training.

"(2)  Taxes on property levied or imposed by a unit of government whose principal function is to provide educational services shall be considered to be dedicated to fund the public school system unless the sole purpose of a particular, voter approved levy is for other than educational services or support services as defined in this section.

"(3)  Taxes on property levied or imposed by a unit of government whose principal function is to perform government operations other than educational services *shall be considered to be dedicated to fund the public school system only if the sole purpose of a particular voter approved levy is for educational services* or support services as defined in this section."

(Emphasis added.)

Voters subsequently approved the levy. Many of the tax accounts within the school districts' boundaries, however, already were being assessed at the Measure 5 maximum rate of $5 per $1,000 of real market value for education-related property taxes at the time that the levy was approved. Taxpayers, whose property fit the foregoing description, initiated an action before the Tax Court seeking a determination regarding the propriety of the levy under Measure 5. Specifically, taxpayers argued that the levy exceeded the limits set by Measure 5 on property tax revenues raised to fund the public school system. Taxpayers conceded that the city's categorization of levy funds was correct under the terms of ORS

310.155(3), but asserted that the statute itself was unconstitutional because Measure 5 required that the majority of the revenues derived from the levy be classified as public school funding.

In determining the proper classification for the revenues generated by the levy, the Tax Court relied, in part, on the definition of "educational services" provided by ORS 310.155(4) and (6):

"(4)   As included in this section, 'educational services' includes:

"(a)   Establishment and maintenance of preschools, kindergartens, elementary schools, high schools, community colleges and institutions of higher education.

"(b)   Establishment and maintenance of career schools, adult education programs, evening school programs and schools or facilities for the physically, mentally or emotionally disabled.

"* * * * *

"(6)   'Educational services' does not include community recreation programs, civic activities, public libraries, programs for custody or care of children or community welfare activities if those programs or activities are provided to the general public and not for the benefit of students or other participants in the programs and activities described in subsection (4) of this section."

Ultimately, the Tax Court granted summary judgment in taxpayers' favor, holding that subsections (2) and (3) of ORS 310.155 were unconstitutional because those provisions did not categorize the revenues of a mixed-use levy according to the purpose and intended use of those revenues.[3] The Tax Court concluded that Measure 5 required that the bulk of the levy revenues in question be categorized as taxes raised specifically to fund the public school system because those revenues were dedicated to school-based educational

---

[3] The Tax Court noted that, although this case directly implicated only ORS 310.155(3), it was nevertheless appropriate to discuss ORS 310.155(2) as well because it was a corollary of subsection (3) and was driven by the same construction of the constitutional text. *Urhausen v. City of Eugene*, 18 OTR 395, 404 n 3 (2006). Because it is not at issue in this case, we do not address the validity of subsection (2) in this opinion.

services that were not intended to benefit the public generally. *Urhausen*, 18 OTR at 407-08. The Tax Court ordered the city to refund to taxpayers the amount of property taxes paid during fiscal years 2004-05 and 2005-06 that taxpayers would not have paid had the 93-percent portion of the levy been certified under Measure 5's cap on funds raised for the public school system. The city appeals from that judgment.

■      On review, the issues are (1) whether ORS 310.155(3) is consistent with Measure 5; and (2) if ORS 310.155(3) is not consistent with Measure 5 and therefore is unconstitutional, whether the revenues from the levy in question should be categorized as funding for the "public school system" and subject to the $5 property tax limitation, or as funding for government operations "other than schools" and subject to the $10 tax limitation.

As noted, ORS 310.155(3) provides that, if a governmental unit imposing a levy is not a school unit, then the revenue that the levy raises qualifies as school revenue only if the sole purpose of the levy is for educational services. Here, because the governmental unit in question is not a school unit, ORS 310.155(3) requires that the levy be categorized as funding for "other government" services unless its sole purpose was to fund educational services. Both parties concede, however, that the levy in question had two purposes: funding educational services and funding other government services using funds retained by the city.

The city's principal argument supporting the constitutionality of ORS 310.155(3) focuses on the requirements of Measure 5. The city contends that Measure 5 requires tax levies themselves—rather than the revenues raised therefrom—to be separated into categories. The city refers to this as categorization at the "levy level." The city contends that, because the purpose of the levy in question was not "exclusively" for educational purposes, all the revenues are properly categorized as being for "other government" services. That result, the city argues, is mandated by the text of Measure 5 itself—specifically, the "exclusivity" clause of subsection (1). We turn now to that question.

■    Measure 5 was an initiative measure. When interpreting an initiated constitutional provision, this court attempts to discern the intent of the voters, because, "with respect to [such] provisions, it is the people's understanding and intended meaning of the provision in question * * * that are critical to [this court's] analysis." *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 57, 11 P3d 228 (2000). The best evidence of the voters' intent is the text of the provision itself. *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559, 871 P2d 106 (1994); *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378, 851 P2d 595 (1993). If the voters' intent is clear after consideration of text, then our inquiry is concluded. *Ecumenical Ministries*, 318 Or at 559. However, if the intent is not clear from the provision's text and context, then we proceed to examine the history of the provision, which may include materials set out in the voters' pamphlet. *Id.* at 560 n 8.

Consistently with the foregoing methodology, we begin with the wording of the constitutional provision itself. Subsection (1) of Measure 5 requires that

"[t]axes imposed upon any property shall be separated into two categories: One which *dedicates revenues* raised specifically to fund the public school system and one which *dedicates revenues* raised to fund government operations other than the public school system."

(Emphasis added.)

We observe initially that Measure 5 refers to only "revenues" and "taxes"; it does not mention the levies under which those taxes are imposed. Nevertheless, the city contends that the "exclusivity" clause set out in subsection (1) mandates the result for which it argues. However, the text of that provision refers directly back to the *revenues* that a levy raises, rather than the levy itself:

"Property tax revenues are deemed to be dedicated to funding the public school system *if the revenues are to be used exclusively* for educational services, including support services, provided by some unit of government, at any level from pre-kindergarten through graduate training."

Or Const, Art XI, § 11b(1) (emphasis added).

In short, from a textual standpoint, it is the *revenues themselves* that are the focus of Measure 5. Specifically, Measure 5 emphasizes the purposes for raising the revenues and the use to which the revenues are to be put. It does not follow, then, that a levy must be categorized as funding for "public schools" under Measure 5 only if *all* the revenues under the levy are used exclusively for educational services. Measure 5 requires only that the portion of funds that are to be used exclusively for educational services be categorized as funding for "public schools."

The city argues, however, that that interpretation fails to give any effect to the "exclusivity" clause set out in subsection (1) of Measure 5. We disagree. As the Tax Court noted, the "exclusivity" clause retains importance, because the intended use of any portion of revenues from a levy could serve both general government and school purposes. When the same funds are used for a facility serving both educational and nonschool purposes, for example, the funds would not be used "exclusively" for school purposes. That situation, however, is not at issue here.

Our analysis of the text is supported by this court's decision in *Shilo Inn v. Multnomah County*, 333 Or 101, 36 P3d 954 (2001). That case dealt with a taxpayer who owned two properties in Multnomah County. A portion of the taxes assessed against those properties was levied by extending the school taxing districts' rates, but was disbursed to an urban renewal agency. Although that portion was not used "to fund the public school system," it was nonetheless categorized as funding for "public schools." The taxpayer sought review from the Tax Court, arguing that the portion of taxes provided to the urban renewal agency should be categorized as funding government operations "other than schools." The issue before the Tax Court was whether taxes must be categorized according to the intended use of those taxes or according to the nature of the taxing district imposing the levy.

This court held that Measure 5 requires categorization of taxes according to the uses to which the taxes are dedicated. *Shilo Inn*, 333 Or at 131. Specifically, the court stated:

> "The Oregon Constitution requires that the assignment of an item of tax to the 'school' or 'other government' category

be *based on the purpose to which that item of tax is dedicated.*"

*Id.* (emphasis added). The court further noted:

"[I]n adopting [Measure 5], the voters limited taxes according to their intended use, not according to the principal function of the taxing district whose rate generated those taxes."

*Id.* at 121-22.

The city argues, however, that the holding in *Shilo Inn* is not applicable to this case because *Shilo Inn* dealt with only urban renewal taxation. Specifically, the city asserts that *Shilo Inn* addressed only the narrow issue whether taxes are to be categorized according to the nature of the taxing district whose rate generated the taxes. Because the categorization made in ORS 310.155(3) is not based on the nature of the taxing district in question, the city argues *Shilo Inn* is inapplicable. We disagree. The central holding in *Shilo Inn* is that Measure 5 requires that property taxes be categorized according to the intended use of the revenues and the purpose for which those revenues were raised:

"[T]he text of subsection (1) of Measure 5 provides that the limits set out in that subsection apply to taxes that are to be separated into categories *according to the uses to which those taxes are dedicated.* Nothing in the context of other provisions of Measure 5 alters that conclusion."

*Id.* at 131 (emphasis added). The broad nature of that holding strongly suggests that the rule expressed in *Shilo Inn* warrants a more general application than the city would concede.

We recognize that the principal function of the taxing district in *Shilo Inn* was indeed relevant to the analysis of the issues in that case. Here, although ORS 310.155(3) does not categorize tax revenues by the principal function of the taxing district, the statutory "sole purpose" rule presently expressed in that statutory provision nonetheless often will dictate a result that is, in fact, predicated on the nature of the district levying the tax. For example, if the governmental unit imposing a levy is not a school unit, as is the case here, then all revenues raised will be classified as funding for "other government" services except in the one instance where

the *sole* purpose of the levy is educational services. That result, however, is inconsistent with Measure 5, which contemplates that units of government other than school units may, in fact, provide educational services.

This court has held that all revenues need not be grouped into one, and only one, of the constitutional categories set out in Measure 5. *See Shilo Inn*, 333 Or at 124 (stating principle). Indeed, in holding that it is the intended use and purpose of the revenues that is determinative of their categorization, this court's decision in *Shilo Inn* makes it clear that the "either/or" approach reflected in ORS 310.155(3) is problematic:

> "Nothing in [Measure 5] suggests that taxes that are imposed by a local taxing district for two different purposes *cannot be categorized separately*."

*Id.* (emphasis added).

The city makes a final argument concerning the adoption of Measure 50. In 1997, the legislature proposed and voters adopted Measure 50 as an additional property tax limitation. Measure 50 repealed, *inter alia*, then-existing Article XI, section 11, and replaced it with an entirely new section 11.[4] The city contends that, by adopting Measure 50, the voters implicitly approved the Legislative Assembly's interpretation of Measure 5, as expressed in ORS 310.155. That argument too must fail. Measure 50 did not alter Measure 5's requirement that revenues be categorized according to their intended use. This court affirmed that principle in *Shilo Inn* as well:

> "[W]e conclude that the fact that subsection (11) of Measure 50 is consistent with subsection (4) of Measure 5 is no evidence of the voters' intent to change the directive in subsection (1) of Measure 5 to limit taxes according to their intended purpose."

333 Or at 122. Furthermore, this court stated:

> "We already have concluded that Measure 5 requires the categorization of taxes according to their dedicated purpose

---

[4] The new section 11 did not repeal section 11b, which contains the primary provisions set out in Measure 5.

and that no provision of Measure 50 changes that method of categorization."

*Id.* at 134.

Relevant statutory authority further supports that proposition. ORS 310.060, a companion statute to ORS 310.155, requires taxing districts to file annually a written notice certifying "the ad valorem property tax rate or the estimated amount of ad valorem property taxes to be imposed by the taxing district[.]" Paragraph (2)(e) of that statute requires that the notice state, as a separate item, the "total amount levied that is subject to [Measure 5]." Paragraph (3)(b) then provides:

> "If an item described in subsection (2) of this section is *allocable to more than one category* described in ORS 310.150, the notice shall list separately the portion of each item allocable to each category."

(Emphasis added.) ORS 310.060(3)(b) thus illustrates that the legislature understood that revenues raised by a local option levy can be allocated among more than one category.

Our analysis of the text and context of Measure 5 suggests that revenues raised by a local-option levy must be categorized according to their intended use. Nonetheless, as this court has stated, "caution is required in ending the analysis before considering the history of an initiated constitutional provision." *Ecumenical Ministries*, 318 Or at 559 n 7; *see also Stranahan*, 331 Or at 57 (stating principle). As this court stated in *Stranahan*, "it is the people's understanding and intended meaning of the provision in question—as to which the text and context are the most important clue—that are critical to our analysis." *Id.* at 57. It follows, then, that those materials that were presented to the public help elucidate the public's understanding of the measure and assist in our interpretation of the disputed provision. *Id.* at 64. Those materials include, *inter alia*, information included in the voters' pamphlet, such as the ballot title and the explanatory statement. *See Ecumenical Ministries*, 318 Or at 560 n 8 (so stating).

In this case, the ballot title summary and explanatory statement focused exclusively on Measure 5's role as a

property tax limitation provision. For example, the explanatory statement set forth the purpose of Measure 5 as limiting the total taxes and government charges on property. Specifically, the statement provided:

> "[T]he measure *limits total school taxes* and charges to $5.00 per $1,000 of each property's real market value, and total nonschool taxes and charges to $10.00 per $1,000."

Official Voters' Pamphlet, General Election, Nov 6, 1990, 33 (emphasis added).

Similarly, this court has held, and the city concedes, that the basic directive of Measure 5 is that it "limits the taxes that may be imposed on any property by limiting tax rates." *Coalition for Equit. School Fund. v. State of Oregon,* 311 Or 300, 310, 811 P2d 116 (1991). If constitutional, however, ORS 310.155(3) would render meaningless the $5 limit on funding for public schools in circumstances such as this, thereby violating that directive. That is true because Measure 5 does not refer to a combined $15 limit. Instead, it refers to dollar limits according to their categories: $5 for the public school system, and $10 for other government purposes. *See Shilo Inn,* 333 Or at 128 (so stating). If ORS 310.155(3) is constitutional, then it would be possible for a nonschool taxing unit to devote virtually its entire funding under the $10 limit to public schools, thereby ignoring the $5 limit on funding for "public schools."

Although ORS 310.155(3) mandates the result sought by the city, that result is not consistent with the wording of Measure 5 or with this court's decision in *Shilo Inn.* Consequently, we conclude that Measure 5 requires revenues raised by a mixed-use levy to be allocated among categories according to the intended use of the revenues and the purposes for which those revenues were raised. To the extent that ORS 310.155(3) limits the categorization of revenues from mixed-use levies to only one category in circumstances such as this, that provision is inconsistent with Measure 5 and therefore is unconstitutional.

■ Having determined that Measure 5 requires the levy's proceeds to be categorized according to their intended

use, we turn now to the question of ascertaining the intended uses for the revenues raised by the levy in question.

Taxpayers concede that seven percent of the levy's revenues were dedicated to funding government services "other than schools." Taxpayers contend, however, that the remaining portion of the revenues provided to the school districts should be categorized as funding for the "school system." The city contends that the proper categorization of that portion of the levy's revenues is under the "other than schools" category because the levy serves legitimate municipal goals that are not exclusively educational in nature.

In determining whether the bulk of the levy properly fits within the statutory definition of educational services, we turn first to ORS 280.080. That statute requires that, whenever a proposed local-option levy is submitted to the voters, the ordinance pursuant to which the election is called must set forth the purpose for the levy.[5] In this instance, the ordinance stated that the funds raised by the levy were:

> "[F]or funding the development of school-based music and physical education classes, school-based nurses, counselors and librarians, school-based athletics and student activities and city youth activities."

*Urhausen*, 18 OTR at 405.

A look to the voters' pamphlet is also informative. Arguments in favor of the levy that appeared in the voters' pamphlet stated specifically that the majority of the levy's revenues would be dedicated to the school districts for educational programs. Moreover, it stated that the levy would be reduced in proportion to any increase in state funding for students. Official Voters' Pamphlet, Ballot Measure 20-67 (2002).

As noted above, ORS 310.155(4) to (6) provide a definition of educational services that helps guide our inquiry.

---

[5] ORS 280.080 provides, in part:

"The order, resolution or ordinance, as the case may be, pursuant to which the election required by ORS 280.060 is called and held, shall set forth:

"(1) The purpose for which the funds to be provided by the tax levies are to be expended."

Subsection (6) exempts from the definition of "educational services" programs or activities that are provided to the general public and not only for the benefit of students. The city contends that the levy in question falls within that exception because the revenues will be used to provide general public programs consistent with its authority to provide those general services to its citizens. We disagree.

To qualify for the exception from the definition of educational services stated in ORS 310.155(6), a program must benefit the general public. Nothing in the levy, however, indicated that funds would be provided for the public generally. Rather, all programs funded by the bulk of the levy were expressly *school based*. Furthermore, the funds allocated to the school districts are tied directly to state funding for *students*, *viz.*, if the state increases student funding, then the levy would be proportionately reduced. Upon review of the record, there is little support for the proposition that the programs funded by the levy fall within the statutory exception to "educational services."

While it may be true, as the city contends, that the services to be funded by the majority of the levy have a strong "social, cultural, health or recreational component," the same could be said for any educational purpose. That logic would render meaningless any distinction between funding for educational services and that for general government operations. As the Tax Court noted:

> "Few would doubt that educational improvement generally results in civic improvement, as a majority of those who voted on the levy appear to have agreed. However, the voters who adopted Measure 5 imposed separate and strict constitutional limits on the actions of majorities, whether acting directly or through a legislative body. Those limits prevent such an equation of civic and educational benefit from operating here to permit educational purposes to be characterized as being those of government generally."

*Urhausen*, 18 OTR at 408. Here, virtually any plausible interpretation of the levy's purpose and intended use leads to the conclusion that the majority of the revenues were raised specifically to fund the public school system. As a result, those revenues must be categorized accordingly.

In summary, Measure 5 requires that property taxes be separated into two categories, "school system" and "other than schools," according to the use to which the revenues are to be put. To the extent that ORS 310.155(3) limits categorization of the proceeds of a mixed-use levy to only one category in certain circumstances, that statutory provision is unconstitutional. Here, 93 percent of the revenue raised by the levy in question is allocated to the school districts and funds the public school system; it therefore is subject to the $5 per $1,000 limitation. The remaining seven percent of the revenue generated by the levy is properly categorized as for government services "other than schools."

The judgment of the Tax Court is affirmed.