90 June 16, 2015 No. 12

IN THE OREGON TAX COURT
REGULAR DIVISION

Teresa McGUIRE, et al.,
*Plaintiffs,*
*v.*

CITY OF PORTLAND
and Portland Development Commission,
*Defendants,*
*and*

PORTLAND STATE UNIVERSITY,
*Defendant-Intervenor.*

(TC 5226)

Plaintiffs (taxpayers) filed an action seeking declaratory judgment as to whether revenues raised by Defendant Portland Development Commission (PDC) to fund its obligations under a disposition and development (D&D) agreement between itself and Defendant-Intervenor Portland State University (PSU) were raised specifically to fund the public school system by reason of being dedicated exclusively for educational services. Taxpayers argued that funds expended under the D&D agreement to develop or redevelop building spaces, while taxable, would produce rental revenue for PSU and would be owned by PSU. Focusing on these economic benefits to PSU, taxpayers argued that the expenditures were therefore to fund the public school system. PDC argued that while there could be incidental benefits to PSU by reason of the D&D agreement, its purpose in expending funds was to insure that taxable commercial space was developed or redeveloped in the urban renewal area in which PSU is one important resident. PDC then pointed to the tax increment revenues (TIF) that would accrue by reason of that activity as well as the reduction of blight that would occur. PDC argued that both of those factors are benefits that perfectly fit the general government urban renewal purposes of PDC. Granting Defendants' joint cross-motion, the court ruled that nothing in Measure 5 or other law prevented the government agencies involved here from doing what they proposed to do, and that the text of Measure 5 both allows and requires that the revenues received by PDC be categorized as for general government purposes.

Oral argument on cross-motions for summary judgment was heard June 1, 2015, in the Multnomah County Courthouse, Portland.

Gregory J. Howe, Attorney at Law, Portland, filed the motion and argued the cause for Plaintiffs (taxpayers).

James T. McDermott, Ball Janik LLP, Portland, filed the cross-motion and argued the cause for Defendant Portland Development Commission.

J. Scott Moede, Portland Office of City Attorney, Portland, joined the cross-motion for Defendant City of Portland.

Robert T. Manicke and Eric J. Kodesch, Stoel Rives LLP, Portland, joined the cross-motion for Defendant-Intervenor Portland State University.

Decision for Defendants rendered June 16, 2015.

**HENRY C. BREITHAUPT, Judge.**

## I.   INTRODUCTION

This matter is before the court on the second amended complaint (Complaint) of Plaintiffs (taxpayers). Taxpayers seek a declaration that property tax revenues raised to fund the commitments of Defendant Portland Development Commission (PDC) under an Agreement for Disposition and Development of Property (the D&D Agreement) between Portland State University (PSU) and PDC must be characterized as revenues "dedicated to funding the public school system" for purposes of Article XI, section 11b, of the Oregon Constitution (Measure 5).

This case is before the court on cross-motions for summary judgment. At the hearing on this matter, taxpayers withdrew the second and third counts of the Complaint. Specifically, taxpayers raise no challenge to the authority of PDC to enter into and fully perform its obligations under the D&D Agreement.

The first count of the Complaint remains to be decided and it is against that count that Defendants have moved for summary judgment.

The parties have entered into a stipulation of facts and no party suggests that any material question of fact exists so as to prevent summary judgment.

## II.   FACTS

The stipulation of facts and related exhibits indicate the following:

(1)   The parties to the D&D Agreement are the City of Portland, acting by and through PDC, and the State of Oregon, acting by and through PSU. The D&D Agreement

contemplates a cooperative venture between PSU and PDC for the development or redevelopment of real estate that is or will be owned by PSU.

(2)   Pursuant to the D&D Agreement, PDC will provide cash funding for development of property owned by PSU. Provision of such funding is contingent on PSU developing commercial space in the property with a value equal, at least, to the amount of cash funding from PDC. The taxable space will both generate tax increment revenues (TIF revenues) and, in the opinion of PDC, serve to eliminate blight and achieve other goals that achieve the purposes of PDC.

(3)   Pursuant to the D&D Agreement, PDC will transfer certain buildings to PSU in exchange for a promissory note, or notes, in an amount equal to the value of the buildings transferred by PDC. The promissory notes will be forgiven by PDC to the extent that PSU develops the buildings so as to produce taxable real property with a value equal, at least, to the value of the buildings transferred, an amount that will also correspond to the face value of the promissory note or notes received by PSU.

(4)   The projects to be developed or redeveloped by PSU pursuant to the D&D Agreement are multiuse projects that will contain space devoted to educational functions of PSU (nontaxable educational space) as well as space devoted to commercial or retail activities (taxable commercial space).

(5)   The parties have specifically stipulated that "[t]he D&D Agreement describes the purposes for which the PDC and PSU intend that the revenues that are the subject of plaintiffs' Second Amended Complaint will be used."

(6)   The parties have specifically stipulated that "[t]he projects will provide urban renewal benefits within an urban renewal area."

## III.   ISSUE

Taking into account the counts of the Complaint withdrawn by taxpayers at the hearing on this matter, the issue for decision is whether revenues raised by PDC to fund its obligations under the D&D Agreement are "raised

specifically to fund the public school system," by reason of being dedicated "exclusively for educational services, including support services."[1]

# IV.   ANALYSIS

## A.   *Transfers of Buildings*

The constitutional text of Measure 5 speaks only to a categorization of property tax revenues that, upon receipt, are dedicated to and therefore spent for a particular purpose. The text does not require, permit or even contemplate consideration or categorization of the dollar value, or cost, of assets of a governmental unit already on hand at the beginning of a property tax cycle and, therefore, not derived from the current levy of property taxes.

For the reasons set forth below, the assertion of taxpayers that transfers of buildings already owned by PDC are subject to a challenge under Measure 5 is without merit.

The record in this matter does not disclose how the buildings that are subject to the D&D Agreement were acquired by PDC. Any such real estate could have been donated to PDC (*see* ORS 457.190(1)[2] authorizing urban renewal districts to receive grants and contributions), funded with income from TIF revenues attributable to prior urban renewal activity, purchased with property tax revenues from earlier years subject to Measure 5 restrictions, or even funded with tax receipts from years prior to the advent of Measure 5 and on hand at the time of adoption of Measure 5. Further, the current value of any asset on hand could well be much greater than the cost of the asset to PDC or the value at the time PDC received the asset.

---

[1] The quoted provisions are taken from the text of Measure 5. Or Const, Art XI, § 11b(1). That text presents something of a challenge because it talks of "categories" which "dedicate" revenues to general government purposes or alternatively school purposes. It seems to the court that a "category" does not "dedicate," but rather reflects a dedication done by an actor. In this proceeding and earlier cases, the actor is a unit of government that dedicates revenues to be raised by a levy to general government purposes, to school purposes, or to some combination of the two. The question then becomes whether any categorization of dedicated funds is constitutionally correct, or not.

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

In all those events, the disposition of property simply does not fit either the text of Measure 5 as to categorization or the mechanics of Measure 5 as to compliance and taxpayer relief. Taxpayers point to no evidence that their reading of Measure 5 was intended by the voters who adopted Measure 5. The arguments of taxpayers in this regard have the same shortcoming as did one aspect of the opinion of this court in the case of *Shilo Inn v. Multnomah County*, 333 Or 101, 124, 36 P3d 954 (2001)—they lack a textual predicate.

The text of Measure 5 fits the annual property tax cycle. Tax levies and the testing of such levies against constitutional limitations must be done on an annual basis. Critically, compliance with Measure 5 must be done in advance of a levy. *Urhausen v. City of Eugene*, 18 OTR 395, 400-01, *aff'd*, 341 Or 246, 142 P3d 1023 (2006). Measure 5 only addresses and can only be applied to property tax amounts *to be* spent from revenue *to be* raised. It is only such dollar amounts that are referred to in the text of Measure 5. Those dollar amounts are used in the Measure 5 computation of tax limits, which are expressed in terms of dollars per thousand of tax levy, and the relief, through compression, that may be required to produce a current dollar remedy for a taxpayer.[3]

The Measure 5 calculations are done by placing the amount of school items in a numerator and the value of a property in the denominator. A similar calculation is done for nonschool items. Setting aside tax items not subject to the Measure 5 provisions, the aggregate school and nonschool items together comprise the total amount of the levy.

Taxpayers read Measure 5 as requiring that the value of assets disposed of by PDC under the D&D Agreement be added to the numerator of the formula for purposes of computing whether tax on any given property of a taxpayer exceeds the school limit. However that step puts a dollar amount in the numerator of the calculation without any textual support for the addition. Measure 5 and

---

[3] As our Supreme Court pointed out in *Urhausen*, "it is the *revenues themselves* that are the focus of Measure 5." *Urhausen*, 341 Or at 254 (emphasis in original).

the implementing statutes refer only to amounts of the current levy. They do not permit or require that any other dollar amount attributable to assets on hand be added to the numerators in the calculation.

In addition to the lack of any textual support for their position, the argument of taxpayers presents a second problem. It is not difficult to imagine that if taxpayers' approach were to be adopted, the numerators of the Measure 5 ratios could be swollen to a level where disposition of assets on hand would have the effect of "using up" the constitutionally permitted ratios—resulting in units of government being unable to raise operating cash for the upcoming year. Taxpayers point to no source indicating that was the intent of the voters who adopted Measure 5.

At the hearing on this matter, taxpayers conceded that they could not describe what remedy would be appropriate if the court agreed with them as to categorization of the transfers of property called for by the D&D Agreement. They could propose no formula or mechanism for converting their legal theory into a remedy that fit either the property tax cycle or the text of Measure 5 as to both limits and remedies. Nor can the court think of a remedy that could be fashioned within the constitutional language of Measure 5. The fact is that the disposition of assets on hand at the beginning of a tax year is a matter quite different from the categorization of revenues to be raised by a levy in the same year.

The court concludes that the reason no remedy can be thought of that fits the situation is because, as explained, the situation is not addressed by Measure 5 and the action cannot constitute a violation of the substantive limitation imposed by Measure 5.

B. *Application of Measure 5 to Categorization of Expenditures from Current Levy*

The parties accept that some of the dollars received by PDC from the current year levy will be spent in the year in question to fund the undertakings of PDC pursuant to those provisions of the D&D Agreement that call for a transfer of cash from PDC to PSU.

The question is the purpose of those transfers of cash obtained from the tax levy. In terms of the constitutional text, the question is: Are those expenditures made exclusively to fund the public school system?

The court addresses this question in the context of two prior decisions of the Oregon Supreme Court: *Shilo Inn* and *Urhausen*.

In *Shilo Inn*, the court was presented with funds expended by PDC. *Shiloh Inn*, 333 Or at 104-05. Although expended by PDC in furtherance of its general urban renewal activities, the funds had been categorized as for school purposes because the tax rate of a school district had been used to calculate the amount of revenue that would be transferred to and spent by PDC. *Id.* at 104. The court concluded that it was the use of funds, not the nature of the governmental unit whose rate was used in the levy process, which determined the correct categorization under Measure 5. *Id.* at 121-22, 134. Accordingly, the expenditure of funds was considered to be for the general government purposes of PDC and not the public school purposes of the district whose property tax levy numbers were used in setting the amount of tax.

*Shilo Inn* is not directly relevant in this case. Although an urban renewal agency, indeed the same one, is involved, no party argues that the proper categorization of tax revenue is dependent on anything other than PDC's purpose in making the expenditures—that is, what the expenditures are for.

The parties do, however, differ as to the purpose of the expenditures of cash derived from the tax levy amounts that have been categorized by PDC. As noted above, taxpayers argue that the expenditure is for schools while PDC argues the expenditures are for its general governmental activity of urban renewal.

Taxpayers argue that funds are expended under the D&D Agreement to develop or redevelop building space that, while taxable, will produce rental revenue for PSU and will be owned by PSU. Focusing on these economic benefits to PSU, taxpayers argue that the expenditures are therefore to fund the public school system.

PDC argues that while there may be incidental benefits to PSU by reason of the D&D Agreement, its purpose in expending funds is to insure that taxable commercial space is developed or redeveloped in the urban renewal area in which PSU is one important resident. PDC then points to the TIF revenues that will accrue by reason of that activity as well as the reduction of blight that will occur. Both of these, PDC argues, are benefits that perfectly fit the general government urban renewal purposes of PDC. PDC concludes these results are all that is required to support a categorization of the tax revenues that produce them as dedicated to general government activities.

There is no doubt that the expenditures of cash by PDC have multiple purposes. However, even if those expenditures can in some way be viewed as supporting PSU, taxpayers have stipulated that the actions of PDC under the D&D Agreement will provide urban renewal benefits within an urban renewal area. Nor do taxpayers question that production of, or attempts to produce, urban renewal benefits are general government activities.

The question then reduces to how Measure 5 is to be applied to mixed-use expenditures. On this question *Urhausen* is both instructive and, in the opinion of this court, controlling.

In *Urhausen*, voters in a city approved a local option levy. 341 Or at 248. Of the proceeds of the levy, approximately 93 percent were devoted to contracts between the city and certain school entities for provision of school-based nursing and other services. *Id.* Seven percent of the levy was to be used for general government operations. *Id.* The city categorized all tax revenue as dedicated to general government operations because the city was spending the revenue under contracts with others. *Id.* at 249-50. The city relied on the provisions of ORS 310.155(3) in taking its actions. *Id.* at 250. Parties challenging that categorization asserted that the disposition of the 93 percent increment was, in fact, an expenditure for schools that had to be categorized as such pursuant to Measure 5. *Id.* at 250-51.

Both this court and the Supreme Court concluded that the expenditures by the city pursuant to contracts of

the 93 percent increment were expenditures for school purposes under Measure 5. *Id.* at 248, 251-52. Although the funds were, in some sense, spent by the city, the contract terms rendered the expenditures as being exclusively for purposes of public education. The city argued that because the levy proceeds were not exclusively devoted to school purposes, the provisions of Measure 5 and ORS 310.155(3) permitted a categorization of the levy proceeds as for general government purposes.[4] *Id.* at 250, 252.

Both this court and the Supreme Court rejected the city's arguments as to the operation of the exclusivity clause of Measure 5 and the validity of ORS 310.155(3). *Id.* at 248, 251-54. *Urhausen* clearly holds that for tax levies, the proceeds of which are divided between school and nonschool expenditures, the Measure 5 limits are to be applied at the level of expenditures and not at the level of the levy. *Id.* at 258. Accordingly, the exclusivity clause does not allow categorization of an entire levy as being for general government simply because some of the proceeds of the levy are used for general government purposes.

In the course of its argument in *Urhausen*, the city asserted that the position of the challengers—and the one adopted by the courts—would render the exclusivity clause of Measure 5 meaningless. *Id.* at 254. That would be the case because all multiple-purpose expenditures would be divided and there would be no need for the exclusivity rule. The Supreme Court rejected that argument, observing:

> "As the Tax Court noted, the 'exclusivity' clause retains importance, because the intended use of any portion of revenues from a levy could serve both general government and school purposes. When the same funds are used for a facility serving both educational and nonschool purposes,

---

[4] Measure 5 provides that "[p]roperty tax revenues are deemed to be dedicated to funding the public school system *if the revenues are to be used exclusively for educational services,* including support services, provided by some unit of government, at any level from pre-kindergarten through post-graduate training." Or Const, Art XI, § 11b(1) (emphasis added). The statute provides that "[t]axes on property levied or imposed by a unit of government whose principal function is to perform government operations other than educational services *shall be considered to be dedicated to fund the public school system only if the sole purpose of a particular, voter approved levy is for educational services* or support services as defined in this section." ORS 310.155(3) (emphasis added).

for example, the funds would not be used 'exclusively' for school purposes."

*Id.* at 254. Although this observation of the Supreme Court was clearly dicta, this court sees no reason not to apply the reasoning in this case where, unlike the situation in *Urhausen*, a "facility" is involved and the "facility" has multiple purposes. The matter is not comparable to the division of a collection of fungible dollars produced by a levy.

The voters who added Measure 5 to the constitution clearly understood that there could be situations where tax levies might be expended on items that combined both of the Measure 5 categories—that is items that had both school and nonschool purposes. In *Urhausen*, the Supreme Court concluded that direct expenditures on services with exclusive purposes could be, and should be, segregated into the two Measure 5 categories if the intent of the voters was to be fulfilled. *Id.* at 261.

Matters are more complex when, as the Supreme Court recognized, a multipurpose "facility" is involved.[5]

Unlike the easy division of current dollar expenditures as between some activities found to be exclusively school related and some activities that were nonschool in character, facilities with multiple purposes or uses can present division or allocation problems.

The voters who considered Measure 5 could have insisted that it contain a provision spelling out a formula in such cases for allocation as between school and nonschool uses—perhaps relative square footage or even relative time of use as between school and nonschool use of a facility with multiple purposes. They did not do so. Instead, they adopted language that had an easy-to-apply (albeit arguably imperfect) approach. That approach dictates that in the case of a multiple-purpose facility, the presence of any nonschool use causes the revenue used for

---

[5] The observation of the Supreme Court in *Urhausen* does not appear to have been limited only to expenditures for facilities. The court also observed that the "intended use of any portion of revenues from a levy could serve both general government and school purposes." *Id.* at 254.

the facility to be placed in the nonschool, or general government, category.

In this case, the dollars that concern taxpayers are dollars that are used to produce facilities with multiple purposes. Taxpayers stipulated that one of the purposes is the general government purpose of urban renewal. No one questions that the facilities also serve school purposes. In such cases of multiple uses, the exclusivity rule of Measure 5 requires that such revenues therefore be characterized as for general government uses.[6] Throughout the argument on the cross-motions, taxpayers couched their objections in terms of Measure 5 requiring categorization of PDC activity as school related because PSU would get an economic benefit from the acquisition of property from PDC, or the improvement of property already owned by PSU. It appears that PSU may, indeed, benefit from the completion of the D&D Agreement. However, taxpayers have stipulated and the court would, in any case, find that PDC will achieve its organizational goals of reducing blight and producing TIF revenue from incremental increases in value of property in the urban renewal area.

As taxpayers concede, nothing in Measure 5 or other law prevents the government agencies involved here from doing what they propose to do. The question is proper categorization of tax revenues used by PDC in fulfilling its undertakings under the D&D Agreement. On that score, the presence of a benefit to PSU is not determinative unless PSU is the only beneficiary. It is not the only beneficiary under the D&D Agreement. PDC and the citizens who enjoy the hoped-for benefits of urban renewal, are also beneficiaries. In such cases, the text of Measure 5 both allows and requires that the revenues received by PDC be categorized as for general government purposes.

## V.   CONCLUSION

The joint motion of Defendants and Defendant-Intervenor is granted. The motion of taxpayers is denied. The Complaint of taxpayers is dismissed, with prejudice.

---

[6] The court need not and does not address the argument of taxpayers that ORS 310.150(7) could, in some cases, be unconstitutional.

Counsel for Defendants and Defendant-Intervenor are directed to submit an appropriate form of judgment. Now, therefore,

IT IS ORDERED that Defendants' and Defendant-Intervenor's Joint Motion for Summary Judgment is granted; and

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment is denied.